EASTERN SUGAR ASSOCIATES (*a Trust*), peticionarios, *v.*
JUNTA AZUCARERA DE PUERTO RICO, recurrida.

Número 3.

*Sometido:* 20 de julio de 1953.   *Resuelto:* 5 de noviembre de 1954.

375.

*Fiddler, González & Nido,* abogados de los peticionarios; *Hon. Secretario de Justicia José Trías Monge, A. Torres Braschi, Procurador Auxiliar, José E. de Guzmán* y *Federico Rodríguez Gelpí,* abogados de la Junta recurrida.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

Eastern Sugar Associates, que operan varias centrales azucareras, radicaron esta solicitud de conformidad con el art. 33 de la Ley Azucarera de Puerto Rico—Ley núm. 426, Leyes de Puerto Rico, 1951 (pág. 1139)—para revisar la Regla núm. 2 de la Junta Azucarera que dispone que la participación de los colonos en el producto de sus cañas se liquidará en dinero, excepto cuando dichos colonos opten por recibir azúcar.[1]   Los peticionarios presentan cuatro contenciones

---

[1] La Regla núm. 2, aprobada el 16 de octubre de 1952, dispone en parte como sigue:

"Artículo I.—Con excepción de los casos a que se refiere el Artículo II de esta Regla, la central liquidará en dinero a sus colonos la participación de éstos en el producto de sus cañas, de acuerdo con las disposiciones de la Ley Azucarera y de la Regla Núm. 1 de la Junta Azucarera.

"Artículo II.—Los colonos tendrán la opción de que su participación en el producto de sus cañas les sea liquidada en azúcar y cuando algún colono antes del 1ro. de diciembre anterior al comienzo de la zafra así se lo notificare a la central, ésta estará obligada a liquidarle en azúcar su participación, de acuerdo con las disposiciones del Artículo 7 de la Ley Azucarera."

principales: (1) La Regla núm. 2 está en conflicto con la Ley núm. 426, especialmente su art. 7; (2) de no estarlo, la Regla núm. 2 y el art. 7 privan a los peticionarios de su propiedad y libertad de contratación sin el debido procedimiento de ley; (3) la vista celebrada en relación con la adopción de la Regla núm. 2 no llenó los requisitos de ley; (4) en dicha vista se admitieron indebidamente en evidencia dos exhibits.

██ Examinemos primeramente el argumento de los peticionarios al efecto de que la Regla núm. 2 está en conflicto

---

El art. III dispone que si un colono notificare a la central con posterioridad al 1ro. de diciembre anterior al comienzo de la zafra su intención de que su participación le sea liquidada en azúcar, la central no estará obligada pero podrá hacer la liquidación en azúcar. El art. IV dispone que cuando un colono no hubiere notificado a la central su intención de liquidar en azúcar y la central le hiciere su primera liquidación en azúcar, el colono tendrá derecho a rehusar dicha liquidación y exigir su liquidación en dinero. El art. V dispone que si un colono no notificare a la central que desea liquidar en azúcar y acepta su primera liquidación sin hacer reparos u objeciones, esto constituye aceptación tácita del sistema de liquidación en azúcar para esa zafra. El art. VI dispone que si el colono opta por liquidar en azúcar, él y la central pueden por acuerdo utilizar a la central como agente para la venta de su azúcar. El art. VII es una cláusula de salvedad.

El art. 7 de la Ley núm. 426 dispone que las liquidaciones se librarán por la central a los colonos quincenal o mensualmente en dinero a base del precio del azúcar ". . . correspondiente a la quincena o mes en que se haya entregado la caña." Sin embargo, el art. 7 dispone que ". . . la Junta podrá, previa audiencia de todas las partes interesadas, proveer otro sistema de liquidación que sea justo y razonable." A tenor con esta última disposición, la Junta luego de una vista promulgó la Regla núm. 1, que fué aprobada por el Gobernador el 18 de marzo de 1952. La Regla núm. 1 dispone que la liquidación en dinero para los colonos será a base del precio promedio del azúcar durante el período de diez meses comprendido entre el 1ro. de enero y el 31 de octure de la zafra en que se muela la caña. El cambio del período quincenal o mensual, según se dispone en el art. 7, al período de diez meses fué hecho por la Junta para ajustarlo al requisito de la Determinación Azucarera del Secretario de Agricultura de los Estados Unidos, de fecha 29 de diciembre de 1951. 17 Fed.Reg. 139. El cumplimiento con la Determinación del Secretario autoriza al productor-elaborador como los aquí peticionarios a recibir los subsidios bajo la Ley Azucarera Federal. En igual forma y por los mismos motivos, mediante la Regla 4, aprobada el 11 de febrero de 1954, la Junta cambió el período usado para calcular el precio promedio al período comprendido entre el 1ro. de marzo de la zafra en que se molió la caña y el 28 de febrero del siguiente año, véase 18 Fed.Reg. 8887 para la Determinación del Secretario del 24 de diciembre de 1953.

con la Ley núm. 426, especialmente su art. 7.([2])   Al interponer esta contención, los peticionarios descansan en los términos tanto del art. 7 como en los del art. 5.   La primera oración del art. 5 habla de ". . . la participación de cada colono en los azúcares y mieles que produzcan sus cañas . . ."; la Parte I-A del art. 5 también hace referencia a "la participación de azúcar perteneciente al colono . . .".   Según los peticionarios, este lenguaje quiere decir que lo que pertenece a los colonos es el azúcar propiamente dicha, y no el producto en efectivo de la venta de ésta.   Y afirman que esto contrasta con la disposición hallada en la Parte II del art. 5 de que la participación del colono en las mieles será liquidada en "el valor"—esto es, el producto en efectivo—de las mieles.   La explicación que ofrecen los peticionarios para esta alegada diferencia en el art. 5 en la liquidación de mieles y azúcar es que históricamente para éstas los colonos siempre han recibido dinero, y no mieles; por otro lado, algunas centrales han liquidado la participación del azúcar producto de la caña en dinero mientras otras la han liquidado en azúcar.

Los peticionarios admiten que la primera oración del art. 7 se refiere a liquidación en dinero.   Según indican, ". . . de

---

([2]) El art. 7 de la Ley núm. 426 dispone como sigue:

"Las liquidaciones provisionales del azúcar correspondiente a los colonos se librarán por la central quincenal o mensualmente, según lo determine la Junta, o en su defecto, por el período de liquidación usado durante el año inmediatamente anterior, tomándose como valor del azúcar para su liquidación el precio promedio de los azúcares de Puerto Rico C. I. F. New York correspondiente a la quincena o mes en que se haya entregado la caña.   De los precios promedios de azúcar de Puerto Rico de 96 grados de polarización en el mercado de Nueva York, determinados según arriba se prescribe, podrá la central descontar las cantidades que estime necesarias para cubrir gastos de embarque y mercadeo en todos los casos de colonos que no optaren por recibir su participación en azúcar según se provee más adelante; *Disponiéndose*, que cuando el colono estime que la cantidad descontada por la central por dichos conceptos es excesiva, podrá solicitar de la Junta que fije la cantidad que deberá descontar la central provisionalmente para esos fines y la Junta queda facultada para así hacerlo; *Disponiéndose, además*, que la Junta podrá, previa audiencia de todas las partes interesadas, proveer otro sistema de liquidación que sea justo y razonable.

"Cuando el colono antes del 1ro. de diciembre anterior al comienzo de la zafra así se le notificare a la central, ésta estará obligada a entregarle

otro modo no hubiera habido necesidad de hablar sobre el precio c.i.f. en Nueva York." Arguyen, no obstante, que esta primera oración ". . . no dice, ni da a entender, que las liquidaciones *deban* hacerse en dinero." Y continúan diciendo: "La segunda oración sigue hablando de liquidaciones que se hacen en dinero pero hace una excepción de los casos de los colonos que opten por no recibir su participación en el azúcar *'según arriba se prescribe'*. Es obvio que por el uso específico de la frase 'según arriba se prescribe' el estatuto habla solamente de aquellos casos en que' el colono, antes del 1ro. de diciembre, *opte porque su participación en el producto de sus cañas le sea liquidada en azúcar.*"

Los peticionarios concluyen de lo anterior que ". . . lo que provee el estatuto es que cuando el método acostumbrado de liquidar las cañas sea en dinero, el colono, haciendo su elección el 1ro. de diciembre, puede exigir que dicha liquidación le sea hecha en azúcar *en vez de en dinero. En ningún sitio se dice expresa o tácitamente que cuando la costumbre sea liquidar en azúcar el colono tiene la opción en cualquier momento de exigir su liquidación en dinero* . . . El que el colono pueda exigir su liquidación en azúcar cuando la costumbre es li-

---

la totalidad del azúcar de 96 grados que le corresponda de acuerdo con esta Ley y los reglamentos promulgados bajo la misma.

"Los colonos que opten porque su participación en el producto de sus cañas le sea liquidada en azúcar, gozarán de derecho de almacenaje en los almacenes de la central hasta el día 31 de diciembre siguiente a la zafra durante la cual se produjeron dichos azúcares sin pago de cantidad alguna por el disfrute de dicho derecho.

"La central le garantizará a los colonos doscientas cincuenta (250) libras de azúcar a 96º por cada saco entregado a compradores hasta el día 31 de octubre siguiente a la zafra durante la cual se produjeron los azúcares del colono. Cualquier cantidad en dólares que resulte en exceso de la referida garantía por diferencia de peso o polarización, será para beneficio de la central. Cualquier cantidad en dólares en defecto de dicha garantía por diferencia de peso o polarización, será reembolsada por la central a los colonos. En ambos casos dichos pagos de reajuste se efectuarán en dinero y no en azúcar.

"La central entregará azúcares a los colonos en sacos nuevos de doscientos cincuenta (250) libras netas cada uno, y en caso de que la central se viere obligada a usar sacos viejos compensará los colonos por la reducción en precio (*penalty*) impuesta a los azúcares como resultado del uso de dichos sacos viejos."

quidar en dinero, desde luego, no le interesa a los peticionarios porque ellos insisten y siempre han insistido en liquidar en azúcar y no en dinero. Una central que de ordinario liquida en dinero podría, desde luego, oponerse a que se le exigiera liquidar en azúcar a opción de los colonos."

Terminan los peticionarios su argumento sobre este punto afirmando que lo anterior ". . . parece ser la más razonable interpretación aun cuando el significado no fuera enteramente claro." Dicen en su alegato: "El artículo 7 del estatuto dispone que cuando las liquidaciones se hacen en dinero, éstas deberán hacerse al precio promedio correspondiente a la quincena o mes en que se haya entregado la caña. El colono a quien se le liquida en dinero no tenía oportunidad de beneficiarse de los precios más altos al finalizar el año. Cuando se hace la liquidación en azúcar, sin embargo, el colono puede vender en cualquier época del año y beneficiarse del precio más alto en el mercado en el otoño, mientras que bajo el sistema de liquidar en dinero, la central tiene la oportunidad de realizar esta ganancia especulativa con los azúcares adquiridos de los colonos." [3]

No estamos de acuerdo con los peticionarios en cuanto al alcance del art. 7. No podemos seguir su razonamiento de que dicho artículo permite a un colono elegir la liquidación en azúcar si ha liquidado anteriormente en dinero, pero que no lo autoriza a elegir la liquidación en dinero si en el pasado ha liquidado en azúcar. Por el contrario, creemos que el art. 7 dispone la liquidación en dinero a no ser que el colono opte por recibir azúcar, independientemente de la práctica anterior de determinada central.

No convenimos con los peticionarios en que el art. 5 trata la participación del colono en relación con azúcar y mieles de manera diferente. En la primera oración del art. 5 se hace

---

[3] Sin embargo, debemos indicar que bajo la Regla núm. 1 de la Junta el colono que liquidó en dinero fué pagado a base del precio promedio computado por un período de diez meses, y no a base del precio quincenal o mensual existente cuando se molió la caña, según proveía originalmente el art. 7. La Regla 4 amplió este período a doce meses. Véase el escolio 1.

referencia a ellos en la misma forma: el estatuto habla de
"... la participación de cada colono en los azúcares y mieles
que produzcan sus cañas ... ". En dicho artículo no se hace
referencia alguna a la participación del colono en el valor, o
en el producto en efectivo, de las mieles. También, el azúcar
y las mieles son tratadas en la misma forma en el *Enten-
diéndose* del primer párrafo del art. 5. Obviamente, tanto
las frases en que descansan los peticionarios como aquéllas
citadas en este párrafo, a nuestros fines, fueron usadas in-
distintamente en el art. 5 y no tuvieron por miras que tu-
vieran algún efecto en el problema ante nos. Además, el
art. 5 no provee primariamente en relación con la liquidación
propiamente dicha con respecto a los colonos; trata princi-
palmente de la participación correspondiente a éstos. En
cuanto a la liquidación, el rol principal lo desempeña el
art. 7. *Antonio Roig, Sucrs.* v. *Junta Azucarera*, resuelto en
el día de hoy (ante pág. 342).(⁴)

Las disposiciones decisivas de la Ley núm. 426, a los fines
de la cuestión ante nos, se hallan en el art. 7. Los peticio-
narios admiten, como ya hemos visto, que la primera oración
en el párrafo primero del art. 7 tiene por miras la liquidación
en dinero. La segunda oración del primer párrafo del art.
7 provee en parte como sigue: "De los precios promedios de
azúcar de Puerto Rico ... podrá la central descontar las
cantidades que estime necesarias para cubrir gastos de em-
barque y mercadeo en todos los casos de colonos *que no optaren*
por recibir su participación en azúcar según se provee más
adelante ...". (Bastardillas nuestras.) El segundo pá-

---

(⁴) Por los motivos ya expuestos, no podemos convenir con los peticio-
narios en el caso de *Antonio Roig, Sucrs., S. en C., South Porto Rico Sugar
Co., Central San Vicente, Inc.* v. *Junta Azucarera*, resuelto en el día de
hoy a base de esta opinión, de que la frase "en pago de éstas" del art. 5
tiende a demostrar que el colono tiene derecho a liquidar solamente en
azúcar. Véase el escolio 17 del caso de *Antonio Roig, Sucrs.* v. *Junta
Azucarera*, resuelto en el día de hoy.

382

rrafo del art. 7 prescribe que cuando el colono antes del 1ro. de diciembre anterior al comienzo de la zafra *así se lo notificare a la central,* ésta estará obligada a entregarle al colono la totalidad del azúcar que le corresponda de acuerdo con la Ley y los reglamentos. El tercer párrafo del art. 7 concede el derecho de almacenaje sin costo alguno en los almacenes de la central a los colonos ". . . *que opten porque su participación en el producto de sus cañas le sea liquidada en azúcar . . .".* (Bastardillas nuestras.) Nada encontramos en las disposiciones arriba transcritas o en las otras del art. 7 que apoye la contención de los peticionarios de que la elección entre los dos métodos de liquidación se concede solamente a aquellos colonos que anteriormente habían liquidado en dinero. Por el contrario, si bien el lenguaje sobre esta cuestión podría ser algo perifrástico, convenimos con la Junta en que el art. 7 leído en conjunto provee básicamente la liquidación en dinero pero otorga al colono la opción de recibir su participación en azúcar.(⁵)

Los peticionarios arguyen que la Regla núm. 2 está en conflicto con el art. 7 de la Ley núm. 426 en tanto en cuanto la Regla núm. 2 dispone que la liquidación debe hacerse en dinero a menos que el colono elija recibirla en azúcar. Esta contención se basa en la premisa de que el art. 7 no otorga al colono la opción de liquidar en dinero cuando la central, como en este caso, ha liquidado anteriormente en azúcar. Pero hemos rechazado esta premisa y hemos concluído que aun bajo las circunstancias anteriores, la liquidación bajo el art. 7 es en dinero a menos que el colono elija liquidar en azúcar. De

_____

(⁵) Vale la pena indicar que el alcance que los peticionarios le atribuyen al art. 7 levantaría una seria cuestión en cuanto a trato discriminatorio: las centrales que habían liquidado en azúcar podrían continuar haciéndolo así, independientemente de los deseos de los colonos, mientras que las centrales que habían liquidado en dinero, serían obligadas a liquidar en dinero o en azúcar a opción de los colonos. En igual forma, los colonos que anteriormente liquidaron en azúcar no tendrían la opción que otros colonos tendrían de liquidar en dinero o en azúcar.

esto surge que la contención de los peticionarios de que la Regla 2 está en conflicto con el art. 7 carece de mérito.

■■ El siguiente punto de los peticionarios es que el art. 7 de la Ley núm. 426 según ha sido interpretado por nosotros y la Regla 2, al disponer que la central debe liquidar en dinero a menos que el colono elija recibir azúcar, les privan de su propiedad y de su libertad de contratación sin el debido procedimiento de ley. (⁶)    En dos casos resueltos por este Tribunal en el día de hoy, las centrales impugnaron la validez de algunas de las disposiciones del art. 6—apartado 6 (c) que dispone el uso de vías portátiles sin costo alguno y el pago de 5¢ por tonelada de caña como gastos de arrimo; el apartado 6 (a) que dispone servicio gratis de grúa en los sitios de entrega—por el fundamento de que violan el debido procedimiento.    Sostuvimos estas disposiciones (1) porque los arts. 5, 6 y 7, al leerse conjuntamente con el resto de la Ley núm. 426, prescriben una reglamentación integrada de la industria azucarera en Puerto Rico sobre una base global; y (2) porque no se adujo testimonio alguno en dichos casos demostrativo de que los gastos ocasionados por los apartados 6 (a) y (c), al aplicarse junto con las otras disposiciones de la Ley núm. 426, resultarían en una pérdida o en ganancias insuficientes para las centrales aquí envueltas. *Antonio Roig, Sucrs.* v. *Junta Azucarera; Eastern Sugar Associates* v. *Junta Azucarera,* núm. 2, resueltos en el día de hoy (ante págs. 342 y 358) .    De igual forma, por los motivos expuestos aquí y en los referidos casos, creemos que la disposición del art. 7 al efecto de que la caña de colonos será liquidada en di-

---

(⁶) Excepto por la incorporación por referencia de la Regla 1, que a su vez es sustancialmente igual a una disposición de la Determinación Secretarial del 29 de diciembre de 1951, la Regla 2 es en efecto una reexposición del artículo 7 de la Ley núm. 426, con algunos detalles adicionales en cuanto al método y forma de su operación que lo implementan.    Véase el escolio 1 y nuestra discusión posterior en cuanto al alegado requisito de una vista. El ataque de los peticionarios es fundamentalmente sobre el derecho del colono a recibir dinero a menos que elija recibir azúcar.    Y dicho derecho, ya hemos resuelto, fué establecido por el artículo 7 independientemente de la Regla núm. 2.

nero a menos que el colono elija recibir azúcar no priva a los peticionarios de su propiedad sin el debido procedimiento de ley.([7])

Al aprobar el art. 7, la Asamblea Legislativa muy bien pudo compartir el criterio expresado por la Junta en este caso de que la liquidación en dinero es beneficiosa a la industria en conjunto porque las centrales tienen más facilidades y otras ventajas para llevar al mercado y vender el azúcar que los colonos individuales, especialmente el colono pequeño, que no goza del historial, de la pericia, de crédito y de otros requisitos para la venta del azúcar; que los pequeños colonos que liquidan en azúcar obtienen precios inferiores por la misma que lo que recibirían en dinero bajo el art. 7 y la Regla 2; que en términos generales, la liquidación en dinero ha sido un método satisfactorio usado aquí durante años; y que si el colono posee medios satisfactorios para vender su azúcar y así lo desea hacer, debe permitírsele liquidar en azúcar. *Cf.* Miller, *The Marketing of Sugarcane in Puerto Rico*, págs. 28–31, 43, descrito más adelante en el escolio 15.([8]) Puede muy bien ser que gastos sustanciales les sean ocasionados a las siete de las treinta y tres centrales que hay en Puerto Rico que en el pasado han liquidado en azúcar y no en dinero, en caso de que un número considerable de sus colonos elijan recibir dinero. Pero en ausencia de prueba al efecto de que este costo adicional a las centrales resulta en una participación confis-

([7]) Más adelante discutimos el problema de cómo los peticionarios pudieron haber presentado prueba del impacto económico del art. 7 sobre sus operaciones en éste o en algún otro procedimiento.

([8]) La Junta manifestó estos puntos de vista, entre otros, en sus conclusiones de hechos. Más adelante resolvemos que es innecesario determinar si estas conclusiones tienen base en la prueba, ya que la Junta no venía obligada a celebrar una vista cuasijudicial y a hacer conclusiones de hechos en este caso. Al incluirlos en el texto de esta opinión, los usamos meramente como ilustración de lo que la Asamblea Legislativa pudo haber tenido en mente, y no como indicativas de nuestro criterio, ya que éstos son "criterios económicos que no carecen enteramente de base." *Secretary of Agriculture* v. *Central Roig*, 338 U. S. 604, 606, escolio 1; *Antonio Roig, Sucrs.* v. *Junta Azucarera*, resuelto en el día de hoy, escolios 13 y 18 (ante pág. 342).

catoria para los peticionarios bajo la Ley núm. 426 en conjunto, no podemos resolver que la disposición del art. 7 de que los colonos recibirán dinero a menos que elijan liquidar en azúcar, bajo las circunstancias de la industria azucarera en Puerto Rico, es inválida.(8a)

▮▮▮▮ Los peticionarios seguidamente se quejan (1) de la resolución de la Junta de que la vista en relación con la adopción de la Regla 2 no tenía que ser cuasijudicial, y (2) de la manera en que dicha vista se celebró. La Junta publicó la propuesta Regla 2 en la prensa y celebró una vista pública en relación con la misma. Los peticionarios y otras centrales comparecieron a la vista pero no ofrecieron prueba. Presentaron solamente cuestiones de derecho. Luego se adoptó la Regla 2. Los peticionarios entonces solicitaron la reconsideración, alegando que para la adopción de la Regla 2 era necesaria una vista cuasijudicial, con la presentación de prueba seguida por conclusiones de hechos. La Junta señaló para vista la moción de reconsideración a fin de que las centrales ". . . discutan sus mociones, substancien sus alegaciones y se presente cualquiera prueba testifical y documental que se estime pertinente." En dicha vista los peticionarios rehusaron presentar prueba. Las centrales envueltas en el caso de *Antonio Roig, Sucrs., South Porto Rico Sugar Co., Central San Vicente, Inc.* v. *Junta Azucarera*, resuelto en el día de hoy por los motivos expuestos en esta opinión, y el abogado de la Junta presentaron prueba oral y documental. La Junta declaró sin lugar la moción de reconsideración y dictó una resolución que contenía conclusiones de hechos.

Como en el caso de varias otras agencias administrativas, la Junta Azucarera tiene facultad bajo la Ley núm. 426 para promulgar tanto reglamentos generales como órdenes que ten-

---

(8a) En este caso y en los otros casos contra la Junta resueltos en el día de hoy los peticionarios descansan entre otros casos en *Mayflower Farms* v. *Ten Eyck*, 297 U. S. 266, y *Thompson* v. *Consolidated Gas Co.*, 300 U. S. 55. Nada encontramos en la decisión o en el lenguaje de estos casos que pueda afectar el resultado aquí. *Cf. Railroad Commission* v. *Oil Co.*, 310 U. S. 573, 583, escolio 1.

gan un impacto individual. Bajo el art. 15 la Junta tiene poder ". . . para oír y decidir cualquier controversia . . ." bajo la Ley o su reglamento ". . . así como cualquier otra controversia que surja entre colonos y centrales." A tenor con este artículo la Junta puede en casos adecuados dictar órdenes que en su impacto resultarían de carácter individual. En tales casos, se requieren vistas cuasijudiciales, seguidas de conclusiones de hechos. Véase *Godreau & Co.* v. *Com. Servicio Público*, 71 D.P.R. 649, 655–6. Luego, bajo el art. 33 se puede radicar una solicitud de revisión de la orden de la Junta ante este Tribunal."Y cuando, como ocurre aquí . . . el estatuto guarda silencio con respecto al alcance de la revisión, las cortes sólo determinan si el cuerpo administrativo cometió error sobre cuestiones de derecho. Sin embargo, una de las cuestiones de derecho es si el récord administrativo contiene evidencia sustancial para basar las conclusiones de hecho del cuerpo administrativo." *Rivera* v. *Benítez, Rector*, 73 D.P.R. 377, 382; *Ledesma, Admor.* v. *Tribl. de Distrito*, 73 D.P.R. 396, 401–2; *Hilton Hotels* v. *Junta Salario Mínimo*, 74 D.P.R. 670, 685–7; XXIII Rev. Jur. U.P.R. 350.

■ Un procedimiento diferente se establece para el reglamento general. Bajo el art. 17 la Junta dictará reglamentos ". . . en relación con la liquidación, disposición, pignoración, aseguro y pago de los azúcares y mieles que produzcan las cañas de los colonos, así como la compensación que deberán recibir los colonos de cada central por concepto de arrastre y arrimo." El art. 21 autoriza a la Junta para dictar ". . . aquell[o]s . . . reglamentos que no sean incompatibles con los términos de esta Ley para la mejor ejecución de la misma . . .". El art. 22 dispone que los reglamentos ". . . tendrán fuerza de ley después de su aprobación por el Gobernador."(⁹) Ni constitucionalmente ni por la Ley núm.

---

(⁹Véanse el art. 5, que dispone una vista ante la Junta cuando ésta fije una participación diferente a los colonos, y el art. 7, que dispone una vista si la Junta establece un sistema de liquidación distinto al fijado en el art. 7. La Junta hizo lo segundo en la Regla núm. 1. Véase el escolio 1.

426, se exigen vistas cuasijudiciales y conclusiones de hechos para la aprobación de los reglamentos generales a ser promulgados bajo los arts. 17 y 21 y a aprobarse por el Gobernador bajo el art. 22. *Godreau & Co.* v. *Com. Servicio Público,* supra, pág. 653; Davis, *Administrative Law,* 238 *et seq.;* Parker, *Administrative Law,* 148, 169.

A la luz de lo anteriormente expuesto, pasemos ahora al problema de si eran necesarias una vista y conclusiones de hechos antes de que la Junta aprobara la Regla núm. 2. En el caso de *Godreau* consideramos un problema similar bajo *otra* ley. En dicho caso expusimos la diferencia según se disponía en la Ley de Servicio Público y en la Ley núm. 221 de 1942 ((1) pág. 1177) entre (1) el procedimiento para establecer el reglamento general para las empresas de servicio público y (2) el procedimiento de acuerdo con el cual la Comisión expide decisiones que afectan a empresas individuales. En el primer caso la Comisión puede, con la aprobación del Gobernador, promulgar reglamentos sin vistas y sin conclusiones de hechos basadas en la prueba. "Siempre y cuando que los reglamentos sean verdaderamente generales, no puede existir objeción válida a este método de promulgarlos. La razón es que toda vez que los reglamentos generales son legislativos en su naturaleza, la Legislatura no viene obligada a proveer una vista cuasijudicial antes de su aprobación." *Godreau & Co.* v. *Com. Servicio Público,* supra, pág. 653, y casos citados; *Bowles* v. *Willingham,* 321 U. S. 503, 519; *Willapoint Oysters* v. *Ewing,* 174 F.2d 676, 692–4 (C.A. 9, 1949), cert. denegado, 338 U. S. 860. En el segundo caso, la Ley de Servicio Público y la Ley núm. 221 proveen una vista en la forma usual cuasijudicial, conclusiones de hechos, y órdenes individuales sujetas a revisión por los tribunales "en vista de los autos" para determinar si la orden "es o no razonable y de acuerdo con la ley." *Godreau & Co.* v. *Com. Servicio Público,* supra, págs. 655–6.

---

*Cf. Godreau & Co.* v. *Com. Servicio Público,* supra, págs. 657–8, en cuanto a la deseabilidad de una vista pública "general" aun cuando la ley no la exija para reglamentos generales de naturaleza legislativa.

Los llamados Reglamentos Generales para las compañías azucareras promulgados a tenor con la Ley núm. 221, Leyes de Puerto Rico, 1942, fueron adoptados por la Comisión como si en verdad fueran reglamentos generales: no se celebró vista cuasijudicial alguna y no se hicieron conclusiones de hechos basadas en la prueba. De conformidad con lo anterior, resolvimos que algunos de estos reglamentos eran nulos porque de hecho eran órdenes individuales que requerían una vista, conclusiones de hechos y una orden sujeta a revisión judicial. Los artículos de los Reglamentos así anulados fueron el art. 7, que provee para arrastre y arrimo de la caña; el art. 11, que provee para la liquidación de cañas y disposición y pago de azúcar; el art. 12, que trata de la liquidación de mieles; y el art. 19, que provee para las tarifas a cobrarse. *Godreau & Co.* v. *Com. Servicio Público*, supra, págs. 659–63.

El razonamiento mediante el cual resolvimos en el caso de *Godreau* que los Reglamentos anteriores eran inválidos no es aplicable a la adopción de la Regla 2 a tenor con la Ley núm. 426 de 1951. En primer lugar, no es de aplicación porque la situación ha cambiado completamente. Dijimos a las págs. 659–60 del caso de *Godreau* que al tratar de determinar si algunos de los llamados Reglamentos Generales eran individuales más bien que generales, debemos tener en cuenta que bajo la Ley núm. 221 de 1942 la Comisión venía obligada a fijarle a las compañías azucareras, que fueron declaradas empresas de servicio público, un beneficio razonable sobre el valor justo de sus bienes dedicados al servicio público. En síntesis, la Comisión venía obligada a tratar a cada compañía como un *problema individual*. *Godreau & Co.* v. *Com. Servivicio Público*, supra, pág. 660; *Cía. Azucarera Toa* v. *Com. Serv. Público*, 71 D.P.R. 212, 224–5, escolio 6. Sin embargo, ha habido un cambio total del concepto de que cada central es una empresa de servicio público cuya tarifa debe fijarse individualmente. La Ley núm. 221 de 1942 fué derogada por la Ley núm. 426 de 1951. "Bajo esta última ley ya no se consideraba a las centrales como empresas de servicio pú-

blico con tarifas a ser cobradas individualmente por cada central según las determinara la Comisión de Servicio Público. La Ley núm. 426 en sustancia retornó al método de participaciones uniformes que se encuentran en la Ley núm. 112 de 1937, si bien con varios cambios, más flexibilidad y más amplios poderes para la Junta Azucarera." *Antonio Roig, Sucrs.* v. *Junta Azucarera,* ante pág. 342, resuelto en el día de hoy. Por consiguiente, bajo la Ley núm. 426 de 1951, que trata a las centrales de manera uniforme, existe un campo considerablemente mayor para la promulgación de reglamentos generales que el que existía bajo la Ley núm. 221 de 1942, que declaraba a las centrales empresas de servicio público y exigía de la Comisión que tratara a cada central y a sus servicios y tarifas como un problema individual.

El segundo motivo por el cual la porción de la opinión del caso de *Godreau* que invalidó unos llamados Reglamentos Generales no es de aplicación aquí es que, aun bajo la norma establecida en dicho caso, la Regla núm. 2 es un reglamento general para el cual no se requiere vista cuasijudicial alguna. La Regla núm. 2—aparte de incorporar la Regla 1 por referencia y de reexponer la disposición del art. 7 de la Ley núm. 426 al efecto de que la liquidación será en dinero a menos que el colono opte por recibir azúcar—meramente implementa el art. 7 en relación con los métodos de operar. Véase el escolio 1. Por tanto creemos que, aun bajo los requisitos más estrictos de la Ley núm. 221, la Regla núm. 2 sería un reglamento general válido el cual la Junta tenía poder para aprobar sin ninguna vista. Véase *Godreau & Co.* v. *Com. Servicio Público,* supra, págs. 663–7, donde resolvimos que reglamentos similares a la Regla 2 eran reglamentos generales más bien que órdenes individuales. *A fortiori,* la Regla 2 era un reglamento válido bajo los arts. 17, 21 y 22 de la Ley núm. 426, que no requieren una vista cuasijudicial ni conclusiones de hechos. ([10])

([10]) Aquí, como en el caso de *Godreau & Co.* v. *Com. Servicio Público,* supra, pág. 659, el haberle la Junta sometido la Regla núm. 2 al Gobernador demuestra la intención de aquélla de hacer un reglamento general

En vista de nuestra conclusión de que la Junta tenía derecho a promulgar la Regla núm. 2 sin vista ni conclusiones de hechos, es innecesario que determinemos si estas conclusiones no tienen apoyo en la prueba. Sin embargo, no debe entenderse como que resolvemos que al atacar la Regla núm. 2 o cualquier otro reglamento de la Junta que le sea aplicable, una parte interesada no pueda ofrecer prueba en apoyo de su posición. Bajo el art. 33 de la Ley núm. 426 cualquier parte ". . . perjudicada por cualquier reglamento dictado por la Junta podrá solicitar de ésta la reconsideración dentro de los veinte (20) días de su promulgación." Durante la vista sobre la moción de reconsideración—o durante una vista sobre una querella que ellos tenían derecho a radicar bajo el art. 15 de la Ley núm. 426 alegando que el art. 7 y la Regla núm. 2 eran nulos en tanto en cuanto los mismos les eran aplicables—los peticionarios podían de así elegirlo, presentar prueba del impacto económico sobre ellos al liquidar en dinero, comparado con sus gastos e ingresos sobre una base global. *Antonio Roig, Sucrs.* v. *Junta Azucarera; Eastern Sugar Associates* v. *Junta Azucarera*, núm. 2; *Colonos de Caña de Santa Juana* v. *Junta Azucarera*, núm. 6, resueltos en el día de hoy. Bajo estas circunstancias, el procedimiento hubiera sido cuasijudicial y la Junta hubiera tenido que hacer conclusiones de hechos. Tal vista y tales conclusiones de hechos también serían necesarias si un colono se quejara de que la central no estaba cumpliendo con el art. 7 y las partes ofrecieran prueba como acabamos de decir. *Antonio Roig, Sucrs.* v. *Junta Azucarera; Eastern Sugar Associates* v. *Junta Azucarera*, núm. 2; *Colonos de Caña de Santa Juana* v. *Junta Azucarera*, núm. 6, resueltos en el día de hoy.([11]) Pero los

___

más bien que una orden individual. Éstas, muy propiamente, son revisadas directamente por nosotros sin la intervención del Gobernador.

([11]) Aun si supusiéramos que las cuestiones de constitucionalidad son para ser determinadas por este Tribunal y no por la Junta, *cf.* Gellhorn y Byse, *Cases and Comments, Administrative Law*, págs. 314-5, y casos citados; *Hillsborough* v. *Cromwell*, 326 U. S. 620, 625, la Junta oye prueba y resuelve los hechos que forman la base para el ataque constitucional ante este Tribunal.

peticionarios no ofrecieron prueba alguna a este efecto. Se limitaron a discutir cuestiones legales y la conveniencia de los términos de la Regla núm. 2. ([12]) Estos eran argumentos que se dirigieron correctamente a la Junta en una vista de carácter legislativo antes de la aprobación final del reglamento. Una vez que se rechazaron y la Regla núm. 2 fué finalmente aprobada, ésta estaba sujeta como en este caso a revisión por este Tribunal de conformidad con el art. 33 de la Ley núm. 426. ([13]) Pero bajo estas circunstancias los peticionarios están en efecto impugnando la Regla núm. 2—y el artículo 7—de su faz. ([14]) Por consiguiente, en ausencia de prueba que tienda a demostrar su impacto individual, no era necesario que la Junta hiciera conclusiones de hechos. ([15])

---

([12]) Los peticionarios contrainterrogaron a los testigos de otras centrales y del abogado de la Junta, quienes ofrecieron alguna "prueba"; pero véase el escolio 15.

([13]) La versión en inglés de la primera oración del tercer párrafo del art. 33 no es una traducción adecuada. La versión original en español dispone que una solicitud de revisión de un *reglamento* de la Junta debe radicarse en este Tribunal dentro de quince días después de su notificación; tal petición deberá radicarse para revisar una *orden* de la Junta dentro de cinco días después de su notificación.

([14]) Distinto a la Ley núm. 221 de 1942, véase *Godreau & Co.* v. *Com. Servicio Público*, supra, págs. 653–5, el artículo 33 de la Ley núm. 426 dispone la revisión por este Tribunal de un reglamento de la Junta. Y tal reglamento puede ser impugnado bien de su faz o según aplicado a un litigante específico a base de prueba. Esto es a tenor con la doctrina al efecto de que bajo algunas circunstancias aun cuando la actuación de una agencia administrativa es de naturaleza legislativa, se puede disponer la revisión judicial de la misma. *Mendoza* v. *Junta Salario Mínimo*, en reconsideración, 74 D.P.R. 749, 750; *Molini* v. *Soc. Mario Mercado e Hijos*, 73 D.P.R. 937, 944–5; véase *Columbia System* v. *United States*, 316 U. S. 407, 417–21.

([15]) Los peticionarios en *Antonio Roig, Sucrs., South P. R. Sugar Co., Central San Vicente, Inc.* v. *Junta Azucarera*, resuelto en el día de hoy a base de esta opinión, ofrecieron alguna "prueba" fragmentada sobre los alegados costos adicionales de liquidar, en dinero. Pero esto se hizo en una vista general en que participaron cuatro centrales. Y ninguna de las "partes" hizo esfuerzo alguno por probar una caso individual y completo demostrativo de su condición económica en conjunto, incluyendo la estructura del capital, los costos y los ingresos. En este contexto, creemos que dicha "prueba", delineada para sostener el argumento de las centrales de que la Junta no debía dar su aprobación final a la Regla núm. 2, no requería conclusiones de hechos que se requerirían en un caso instado (1) por una central o por centrales específicas quejándose del impacto indi-

En vista de nuestra decisión de que la audiencia cuasiju-dicial y las conclusiones de hechos no eran necesarias en re-lación con la adopción de la Regla núm. 2, obviamente no se cometió error perjudicial alguno cuando la Junta admitió en evidencia los Exhibits 15 y 16.([16])   Y, de cualquier modo, véanse *Mario Mercado e Hijos* v. *Com. Servicio Público*, 73 D.P.R. 589; *Hilton Hotels* v. *Junta Salario Mínimo*, supra, pág. 687; *Rhodes Pharmacal Co.* v. *Federal Trade Commis-sion*, 208 F.2d 382, 386-7 (C.A. 7, 1953); *Dolcin Corp.* v. *Federal Trade Commission*, 219 F.2d 742, (C.A. D.C., 1 de ju-lio de 1954); Parker, supra, pág. 227; Gellhorn y Byse, *Cases and Comments, Administrative Law*, págs. 1011 *et seq.*

*La resolución de la Junta Azucarera será confirmada im-poniéndose las costas y gastos a los peticionarios a tenor con el art. 33 de la Ley núm. 426.*

Los Jueces Asociados Sres. Ortiz y Sifre no intervinieron.

---

vidual causado sobre ellas por un reglamento que ya ha empezado a regir, o (2) por un colono que solicite que determinada central cumpla con el mismo. *Cf. Godreau & Co.* v. *Com. Servicio Público*, supra, págs. 657-60; *Logan-sport Broadcasting Corp.* v. *United States*, 210 F.2d 24, 27 (C.A. D. C., 1954).

([16]) El Exhibit 15 es una monografía titulada *The Marketing of Sugar-cane in Puerto Rico.* Fué escrita por Marshall E. Miller, economista agrí-cola, y publicada en noviembre de 1950 bajo los auspicios del Departamento de Agricultura de los Estados Unidos. El Exhibit 16 se intitula *Statistical Summaries of the 1950-51 Sugar Program for Puerto Rico* y fué también publicado por el Departamento de Agricultura de los Estados Unidos.