Los Jueces Asociados Sres. Ortiz y Sifre no intervinieron.

EASTERN SUGAR ASSOCIATES (*a Trust*), peticionarios, *v.* JUNTA AZUCARERA DE PUERTO RICO, recurrida, y RAFAEL APONTE SÁNCHEZ, interventor.

Número 2.

*Sometido:* 2 de marzo de 1953. *Resuelto:* 5 de noviembre de 1954.

360

*Fiddler, González & Nido,* abogados de los peticionarios; *Hon. Secretario de Justicia Interino J. B. Fernández Badillo* y *A. Torres Braschi, José E. de Guzmán* y *Federico Rodríguez Gelpí,* abogados de la Junta recurrida; *Rodolfo F. Aponte,* abogado del interventor.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del Tribunal.

En este caso están envueltos el alcance y la constitucionalidad de las disposiciones del art. 6(a) de la Ley Azucarera de Puerto Rico—Ley núm. 426, Leyes de Puerto Rico, 1951 (pág. 1139)—al efecto de que "La central estará obligada a proveer a todos sus colonos, sin costo alguno para éstos, servicio de grúa y el personal necesario para su operación en cada sitio que la central designe para la entrega de cañas."

La disposición arriba transcrita del art. 6(a) debe leerse en su contexto. El art. 6 establece los términos y condiciones para el arrastre y arrimo de la caña de los colonos. El

art. 6 (*a*) dispone que si la central provee los medios de transportación para la caña de los colonos desde la finca a la central, ésta pagará a aquéllos como compensación por gastos de arrimo 7½¢ por tonelada de caña. Si la central no provee los referidos medios de transportación, vendrá obligada a compensar al colono en las formas y medidas que más adelante se establecen en los arts. 6 (*b*) y (*c*), por la transportación de dichas cañas desde la finca del colono hasta el sitio de entrega designado por la central. Entonces el art. 6 (*a*) expone la oración objeto de controversia en este caso: "La central estará obligada a proveer a todos sus colonos, sin costo alguno para éstos, servicio de grúa y el personal necesario para su operación en cada sitio que la central designe para la entrega de cañas."

El art. 6 (*b*) dispone que si un colono transporta su caña, la central pagará al colono como compensación por gastos de arrimo 15¢ por tonelada de caña, más 5¢ por cada tonelada por kilómetro, desde la finca al sitio de entrega.

El art. 6 (*c*) provee, según hemos visto en el caso de *Antonio Roig Sucrs.* v. *Junta Azucarera*, resuelto en el día de hoy (ante pág. 342), que cuando la central ha venido usando vías portátiles para el arrastre de las cañas de un colono, dicha central vendrá obligada a suplir al colono, sin costo alguno para éste, las vías y el material rodante necesario; además, bajo estas circunstancias la central debe pagar al colono 5 centavos por tonelada de caña por concepto de arrimo.[1]

---

[1] En vista de la importancia que tiene el leer todas las disposiciones del art. 6 conjuntamente, lo insertamos íntegramente a continuación en este escolio.

"Artículo 6.—Para el arrastre y arrimo de las cañas de los colonos, regirán las siguientes cláusulas y condiciones:

"(*a*) La central podrá proveer los medios de transportación para las cañas de sus colonos desde la finca del colono hasta la central, y cuando así los provea, compensará al colono con siete y medio (7½) centavos por tonelada de caña entregada, por concepto de arrimo; *Disponiéndose,* que si durante la zafra de 1950 alguna central hubiese pagado una suma superior por este concepto, este último será el tipo que regirá para dicha central. En caso de que la central no provea los referidos medios de transportación, vendrá obligada a compensar al colono en la forma y medida más adelante establecida, por la transportación de dichas cañas desde la

La central aquí envuelta presenta dos contenciones. Primeramente arguye que su actuación al designar el batey del molino como el punto de entrega fué válida bajo el art. 6, no empece el hecho de que acepta cañas de sus colonos en un punto intermedio y la transporta de dicho punto a la central en un ferrocarril propiedad de la central sin costo alguno para los colonos. La importancia de este argumento es que si convenimos con la central en que bajo estas circunstancias se designó válidamente a la central como punto de entrega, ésta puede ser obligada bajo el art. 6 a suplir servicio de grúa y el personal necesario sin costo alguno solamente en el molino, como punto de entrega, y no en ningún punto intermedio.

La segunda contención de la central se hace en caso de que no estemos de acuerdo con ella en cuanto al primer punto y resolvamos por el contrario que de acuerdo con el art. 6 el sitio de entrega es aquél donde la central físicamente recibe las cañas de los colonos en el punto intermedio. Arguye la central que el art. 6(a) al ser así interpretado infringe el

---

finca del colono hasta el sitio de entrega designado por la central, ya bien dicha transportación se efectúe con equipo propio del colono o arrendado por él. La central estará obligada a proveer a todos sus colonos, sin costo alguno para éstos, servicio de grúa y el personal necesario para su operación en cada sitio que la central designe para la entrega de cañas. Cuando se trate de un colono nuevo o uno que desee cambiar de sitio de entrega de las cañas y la central y el colono no se pongan de acuerdo en cuanto al sitio de entrega, la Junta determinará el sitio en que la central deberá recibir las cañas del colono, de entre los designados por la central.

"(b) En los casos en que el colono haga la transportación de sus cañas, la central le compensará a razón de quince (15) centavos básicos por tonelada de caña transportada, por concepto de arrimo, más la cantidad de cinco (5) centavos por tonelada por kilómetro, desde la finca al sitio de entrega, siempre y cuando la distancia a recorrer desde la finca al sitio de entrega sea de medio kilómetro o más: *Disponiéndose*, que el colono tendrá derecho a recibir la compensación básica de quince (15) centavos aunque la distancia a recorrer desde la finca al sitio de entrega sea menor de medio kilómetro. La distancia, a los efectos de esta compensación, se determinará desde la salida normal o natural de la finca del colono en donde se cortó la caña hasta el sitio de entrega designado por la central; si al determinarse el peso y la distancia en el arrastre y arrimo de las cañas resultare una fracción de kilómetro o tonelada, se pagará la compensación en ambos casos por la fracción proporcionalmente.

"(c) En los casos en que la central haya venido usando vías portá-

debido procedimiento local y Federal en tanto en cuanto exige a la central que provea a sus colonos sin costo alguno el personal para el servicio de grúa en el sitio de entrega.

Eastern Sugar Associates, en adelante denominados los peticionarios, se dedican al cultivo de caña de azúcar y su elaboración y a la elaboración de la caña de numerosos colonos. Los peticionarios son dueños y operan un ferrocarril en el cual transportan su propia caña a sus molinos, y en el que también transportan la caña de los colonos sin costo para éstos. Las cañas de algunos de sus colonos—incluyendo a Rafael Aponte Sánchez, el querellante en este caso—se cargan en vagones de ferrocarril de los peticionarios en un desvío en un sitio conocido por Eugui para ser transportadas a su molino de Santa Juana.

En el desvío Eugui la caña se levanta por medio de una grúa con un brazo que se mueve hasta cierto punto sobre el vagón de ferrocarril desde donde se deja caer al vagón. Los hombres que manipulan la grúa—propiedad de los peticiona-

---

tiles para el arrastre de las cañas de un colono, la central vendrá obligada a suplir al colono, sin costo alguno para éste, dichas vías portátiles y material rodante necesarios, y asimismo vendrá obligada a pagar al colono cinco centavos (5¢) por tonelada de caña por concepto de arrimo. La Central podrá descontinuar la práctica de suplir directamente, o a través de cualquier entidad subsidiaria, agente o contratista, vías portátiles a sus colonos, siempre que obtenga la aprobación previa de la Junta para así hacerlo. La Junta tendrá facultad para ordenar a cualquier central que descontinúe el uso de cualquier sistema de arrastre que a juicio de la Junta resulte perjudicial a los intereses de los colonos o de la industria.

"(d) El pago de la compensación anteriormente provista por concepto de arrastre y arrimo deberá efectuarse por la central semanalmente.

"(e) Las centrales serán responsables a los colonos de las cañas de éstos desde el momento en que las reciban en el sitio de entrega designado por la central, excepto en casos de fuerza mayor, o fuera del control de la central.

"La central en ningún caso vendrá obligada a pagar más de un dólar por concepto de arrastre y arrimo.

"En lo que se refiere a las cañas de la isla de Vieques que se transporten a Puerto Rico, se mantendrá, en cuanto a arrastre y arrimo, lo dispuesto por la Comisión de Servicio Público para la zafra de 1951, hasta tanto la Junta previa audiencia de las partes dispusiere algo en contrario, que será lo que regirá."

rios—y el hombre que se sitúa en el vagón para ocuparse de que la caña quede debidamente colocada en éste, son empleados de la central, la cual paga sus salarios. La controversia en este caso no gira sobre estos empleados. Más bien envuelve el pago del salario de otro hombre que mediante una soga controla el brazo que lleva la caña al punto adecuado sobre el vagón. Este hombre se llama el soguero. Hasta la fecha sus jornales han sido pagados por Aponte.

El 7 de abril de 1952 Aponte radicó una querella ante la Junta Azucarera solicitando que se exigiera a los peticionarios que le reembolsaran los salarios pagados por él al soguero y que en adelante pagaran ellos dicho empleado. Los peticionarios contestaron esta querella. Luego de una vista en que las partes presentaron una estipulación sobre hechos así como testimonio, la Junta dictó resolución ordenando a los peticionarios reembolsar a Aponte los salarios que éste había pagado al soguero y que en adelante pagaran dicho empleado.([2]) Los peticionarios radicaron entonces una solicitud de revisión de la resolución de la Junta a tenor con el art. 33 de la Ley núm. 426.

Examinemos primeramente el problema del alcance de la disposición del art. 6 al efecto de que la central designará el sitio para la entrega de la caña de los colonos y su aplicación a los hechos de este caso. Sostienen los peticionarios que bajo el art. 6 la central está autorizada a designar el sitio de entrega de las cañas de los colonos; que ellos designaron su molino de Santa Juana como el sitio de entrega para la caña de Aponte; que proveen servicio de grúa y el personal necesario en el molino, que es el sitio de entrega designado por ellos, como exige el art. 6(a); y que no se les puede exigir que paguen el soguero que trabaja para Aponte en el desvío Eugui, que no es el sitio de entrega designado por la central.

---

([2]) Suponemos que los términos de esta resolución se aplican desde la fecha en que la Ley núm. 426 entró en vigor.

En apoyo de su contención de que el molino era el sitio de entrega en este caso, los peticionarios presentaron en evidencia tres cartas, fechadas el 28 de noviembre de 1951, escritas por ellos a Aponte, en relación con el arrastre de las cañas de las tres fincas de éste. Estas cartas son idénticas excepto en cuanto a las distancias que en ellas se mencionan desde cada finca al desvío Eugui. El primer párrafo de dichas cartas lee como sigue: "Con el fin de determinar el pago de arrastre por camión de las cañas de nuestros colonos para la zafra de 1952, de acuerdo con la nueva tarifa de 15¢ básicos más 5¢ por kilómetro y proporcionalmente por fracción de kilómetro . . . hemos procedido a hacer un estudio de las distancias desde la salida normal o natural de las fincas de cada colono a los sitios normales de entrega." (³)

El segundo párrafo de las cartas de los peticionarios a Aponte, luego de indicar la salida de la finca específica envuelta y la distancia de la misma hasta la plaza de trasbordo en el desvío Eugui, dice lo siguiente: "De ahí en adelante, la transportación hasta el *sitio de entrega, que será la Central en donde se pese la caña,* será en el ferrocarril de los Associates." (Bastardillas nuestras.) Termina la carta notificando a Aponte que si no presentaba reparos dentro de diez días, se entendería que aceptaba "esta distancia como correcta y la compensación que resultare según la nueva tarifa."

El art. 6 dispone que la central designará el sitio de entrega de las cañas de los colonos. Los peticionarios designaron su molino de Santa Juana como el sitio de entrega de las cañas de Aponte. Sin embargo, obtuvieron la entrega física de dichas cañas en Eugui como hasta entonces habían

---

(³) Aparentemente los peticionarios trataban de cumplir con el art. 6(b) el cual, luego de establecer el tipo básico de 15 centavos más 5 centavos por cada tonelada por kilómetro desde la finca al sitio de entrega, dispone: "La distancia, a los efectos de esta compensación, se determinará desde la salida normal o natural de la finca del colono en donde se cortó la caña hasta el sitio de entrega designado por la central; si al determinarse el peso y la distancia en el arrastre y arrimo de las cañas resultare una fracción de kilómetro o tonelada, se pagará la compensación en ambos casos por la fracción proporcionalmente."

hecho. La Junta resolvió que el art. 6 autoriza a la central a designar el sitio de entrega de las cañas de los colonos; pero que si como en este caso la central de hecho obtiene la entrega física de las cañas de sus colonos en un punto intermedio, dicho punto intermedio es, de acuerdo con el art. 6, el sitio de entrega. Resolvió por lo tanto que el soguero en cuestión era empleado en el sitio de entrega y que por consiguiente sus jornales deben ser pagados por los peticionarios de acuerdo con la disposición del art. 6 al efecto de que la central proveerá en el sitio de entrega servicio de grúa y el personal para el mismo sin costo alguno para el colono.

Cuando un colono transporta sus cañas, puede entregarlas bien (1) en un punto intermedio o bien (2) en el molino. Pero en ningún momento habla el art. 6 de que el colono transporte al molino propiamente dicho; invariablemente usa la frase "sitio de entrega" y nada más. Por consiguiente, la frase "sitio de entrega designado por la central" como la misma se usa en el art. 6 cubre ambas posibilidades: el sitio de entrega puede muy bien ser el molino o un punto intermedio, dependiendo de los hechos de cada caso.[4] ·

■ Debemos por lo tanto determinar qué sitio de entrega designó la central en este caso. Bajo el art. 6 los peticio-

---

[4] Hay en el art. 6 una serie de indicaciones al efecto de que la Asamblea Legislativa vislumbraba la posibilidad de que, además del molino, habría otros sitios de entrega. El art. 6 (a) requiere que la central provea servicio de grúa ". . . en cada sitio que la central designe para la entrega de cañas." Es cierto que esto incluiría el caso de una entidad dueña de más de un molino; pero también cubriría la situación de una entidad que opere sólo un molino con más de un sitio de entrega. El art. 6 (a) confiere también a la Junta Azucarera facultad bajo ciertas circunstancias para determinar un sitio de entrega ". . . de entre los designados por la central."

Al referirse a las distancias por las que se compensa al colono por concepto de arrastre y arrimo, el art. 6 (b) habla en todo momento de la distancia desde la finca al "sitio de entrega", nunca a la central propiamente dicha.

El art. 6 (e) establece la responsabilidad de la central hacia los colonos por sus cañas ". . . desde el momento en que las reciban en el sitio de entrega designado por la central . . .". Si únicamente el molino fuera el sitio de entrega, esta disposición sería superflua: la central sería obvia-

narios tenían derecho a designar su molino de Santa Juana como el sitio de entrega para las cañas de Aponte. Sostienen que fué así designado en sus cartas del 28 de noviembre de 1951. La dificultad con esta contención es que esas mismas cartas y la conducta de las partes bajo las mismas demuestran lo contrario.

Las cartas notificaron a Aponte que, como en el pasado, los peticionarios tomarían la posesión física y control de sus cañas en el desvío Eugui. Y es eso lo que de hecho ocurrió durante la zafra de 1952. Aponte transportó las cañas de sus tres fincas al desvío Eugui, donde los peticionarios, por medio de una grúa de su propiedad y operada por ellos, procedieron a tomar la posesión física de las cañas y a transportarlas a su molino de Santa Juana en su propio ferrocarril.

Bajo estas circunstancias no podemos resolver que la central designó el molino como el sitio de entrega. Por el contrario, cuando una central designa como aquí un punto intermedio en el que tomará la posesión física y el control de las cañas de los colonos, para ser luego transportadas por dicha central al molino por su propia cuenta, la referida central ha designado, a los fines del art. 6, el punto intermedio como el sitio de entrega. La central no puede hacer todos los arreglos físicos y legales para la entrega en un punto intermedio

mente responsable de la caña de los colonos después de haberle sido entregada en el molino.

Finalmente, las grúas en los molinos son propiedad de y operadas por la central. Escasamente hubiese sido necesario disponer que habría servicio de grúa gratis en los sitios de entrega, si se hubiese entendido que bajo el art. 6 el único sitio de entrega sería el molino. *Colonos de Caña de Santa Juana* v. *Junta Azucarera*, núm. 6, resuelto en el día de hoy.

Al disponer para sitios de entrega en adición al molino, el art. 6 siguió el patrón histórico. Véase el art. 7 de la Ley núm. 112, Leyes de Puerto Rico, 1937 (pág. 271), según fué enmendada por la Ley núm. 213, Leyes de Puerto Rico, 1938 (pág. 428).

Dijimos en *Colonos de Caña de Santa Juana* v. *Junta Azucarera*, núm. 6, resuelto hoy, que al disponer en el art. 6 servicio de grúa gratis en los sitios de entrega, la Asamblea Legislativa enfocó su atención primordialmente sobre los puntos intermedios y sólo incidentalmente sobre los molinos como tales sitios de entrega.

y entonces simplemente por una ficción legal que no concuerda con los hechos, designar otro sitio—el molino—como el sitio de entrega con el fin de evitar su obligación bajo el art. 6 de proveer a sus colonos servicio de grúa y personal libre de costo en el sitio donde el colono de hecho le entrega sus cañas. La disposición del art. 6 sobre el servicio de grúa y de personal en el sitio de entrega no puede ser derrotada tan fácilmente.

El hecho de que no se pese la caña hasta que llega al molino no es incompatible con el concepto de que la entrega según se define en el art. 6 ha sido efectuada en un punto intermedio. El estatuto claramente admite la posibilidad de que la central designe sitios de entrega en adición al molino. El art. 6 dispone tal cosa a pesar del hecho bien conocido de que las cañas de los colonos se pesan en el molino. Y nada hay en el art. 6 que exija que el sitio de entrega sea un sitio donde no solamente se pese la caña sino también se entregue la misma. El art. 6 significa por lo tanto que cuando las cañas se entregan en una plaza de trasbordo, se entregan sujetas a la determinación posterior de su peso.

El fin primordial del art. 6 es establecer la compensación al colono por concepto de arrastre y arrimo. Las cartas de los peticionarios a Aponte hablaban principalmente de ese problema. Los peticionarios expresaron en ellas sus cálculos sobre las distancias desde las tres fincas de Aponte al desvío Eugui para facilitar el cómputo de la compensación a que Aponte tenía derecho por concepto de arrastre y arrimo a razón de 15 centavos por tonelada más 5 centavos por tonelada por *kilómetro* según dispone el art. 6(*b*). Véase el escolio 1 y el texto de la opinión que le precede. Los peticionarios no incluyeron la distancia desde el desvío Eugui hasta el molino a los fines de calcular dicha compensación. Esto fué a base de que la central obtenía la entrega de las cañas en el desvío Eugui y luego las transportaba en su propio ferrocarril por su propia cuenta. Pero esto sólo sirve para recalcar la realidad de este caso: el sitio de entrega, a los fines del art. 6, que trata primordialmente de la compensación a

pagarse a los colonos por concepto de arrastre y arrimo, fué de hecho y de derecho el desvío Eugui y no el molino de Santa Juana.(5)

▆ El art. 6 no requiere necesariamente que la central designe de manera formal los sitios de entrega, por escrito u oralmente. La conducta de las partes que de hecho utilicen el molino o cualquier punto intermedio como el sitio de entrega sería suficiente para hacer aplicables a la transacción los términos del art. 6. De igual modo, la designación por carta de un sitio de entrega en contravención de los hechos no tiene efecto legal. Bajo el art. 6 lo decisivo es lo que las partes hacen, no lo que dicen. Véase *Vélez* v. *San Miguel*, 68 D.P.R. 575, 584. *Cf. González* v. *Bowie*, 123 F.2d 387 389–90 (C.A. 1, 1941), para el lenguaje usado al examinar un problema diferente bajo un estatuto distinto pero que creemos sostiene nuestro criterio.

▆ Los peticionarios arguyen que su función ". . . según dispone el estatuto, es moler las cañas de los colonos en su molino o molinos y pagarle al colono el por ciento de azúcar y mieles fijado por tal servicio. En la propia naturaleza de las cosas, esta función no comienza ni puede comenzar hasta que la caña es entregada en el batey del molino. El arrastre y arrimo de las cañas al molino son operaciones preliminares al proceso de molienda y no parte de éste. Ningún proceso de elaboración comienza o puede comenzar hasta que la materia prima llega a la fábrica. Cómo llega es inmaterial a dicho proceso."

El párrafo que precede es otra manera de presentar el argumento que hemos rechazado en *Antonio Roig, Sucrs*. v. *Junta Azucarera*, resuelto en el día de hoy, de que la industria

---

(5) Llamarle sitio de entrega al punto intermedio donde la central de hecho recibe las cañas de los colonos, es cosa que no se desconoce en Puerto Rico. *Cf.* el art. 7 de la Ley núm. 112, Leyes de Puerto Rico, 1937, según fué enmendado por la Ley núm. 213, Leyes de Puerto Rico, 1938; *Bowie* v. *González*, 117 F.2d 11 (C.A. 1, 1941), en el que, al discutir un problema diferente la corte habla a la pág. 15 de centrales de los peticionarios que ". . . aceptan entrega . . ." de cañas de colonos en ". . . puntos fuera del molino . . ."; *Calaf* v. *González*, 127 F.2d 934, 937 (C.A. 1, 1942).

azucarera está dividida en dos compartimientos impenetrables —el agrícola y el industrial—y que la Asamblea Legislativa no puede reglamentar la industria azucarera en su totalidad sobre una base global. Además, afirmar como afirman los peticionarios que la función del molino ". . . según dispone el estatuto, es moler las cañas de los colonos . . . y pagarle al colono. . . " por ellas es actuar como si el art. 6 no fuese parte de la Ley núm. 426. Siempre y cuando que el art. 6 sea constitucional, no podemos tan fácilmente eliminarlo del estatuto.

Por último, los peticionarios arguyen que el servicio de grúa precede y no es tan siquiera parte de la transportación; que toda vez que ellos muelen las cañas de Aponte y de otros colonos a base de un por ciento ellos nunca obtienen título a la caña del colono y son meramente depositarios a los fines de elaborarlas, cf. *Commissioner of Int. Rev.* v. *San Carlos Milling Co.*, 63 F.2d 153, 155 (C.A. 9, 1933); y que ellos meramente actúan como agentes del colono al transportarle la caña desde el desvío Eugui hasta el molino, que es por consiguiente el sitio de entrega. Por varios motivos no nos convencen estos argumentos. Pero la mejor contestación a los mismos es que los términos del art. 6(a) exigen que la central provea servicio de grúa y personal libre de costo en los sitios de entrega; y tal como interpretamos el art. 6(a), según el mismo se aplica a los hechos de este caso, el desvío Eugui era el sitio de entrega para las cañas de Aponte.

El dejar Aponte de hacer reparo alguno dentro de diez días en relación con las cartas del 28 de noviembre de 1951 como exigía el tercer párrafo de las mismas, no altera nuestra conclusión. En primer lugar, dichas cartas trataban principalmente de la compensación a pagarse a los colonos por concepto de arrastre y arrimo y mencionaban el sitio de entrega de manera algo indirecta. En segundo lugar, se le pidió a Aponte que comentara tan sólo sobre los cálculos de las distancias desde sus fincas al desvío Eugui a los fines de la compensación. Su silencio presumiblemente se limitó a convenir

con dichos cálculos. Pero más importante aún que estos dos puntos es la disposición del art. 34 de la Ley núm. 426 al efecto de que todo contrato o práctica en contravención del estatuto u órdenes o reglamentos de la Junta será nulo. Por lo tanto, aun suponiendo que en virtud de las cartas se celebró un contrato, éste sería nulo según se aplica el mismo a los hechos de este caso porque estaría en conflicto con el art. 6 como lo hemos interpretado más arriba con respecto a los sitios de entrega.

Resolvemos que bajo el art. 6 (a) los peticionarios vienen obligados en este caso a proveer a Aponte servicios de grúa y personal, libre de costo, en el desvío Eugui como sitio de entrega. Esto incluye el pago del salario del soguero. Pasemos ahora a la contención de los peticionarios de que, así interpretado, el art. 6 (a) infringe el debido procedimiento de ley local y Federal.

 Al atacar la constitucionalidad de la disposición del art. 6 (a) que exige que la central provea servicio de grúa gratis en los sitios de entrega, los peticionarios pretenden que leamos esa disposición del art. 6 (a) aisladamente del resto de la Ley núm. 426. Insisten en que la compensación del colono está "totalmente cubierta" por el art. 5, y que el art. 6 les obliga a prestar o pagar por servicios ". . . que no forman parte del proceso de elaboración." Pero como dijimos en los casos de *Antonio Roig, Sucrs.* v. *Junta Azucarera,* e *Eastern Sugar Associates* v. *Junta Azucarera,* núm. 3, resueltos en el día de hoy, los arts. 5, 6 y 7 han de ser leídos conjuntamente a fin de hallar la compensación para los colonos sobre una base global. Solamente si la prueba demostrara que estos artículos, leídos conjuntamente, resultan en una participación confiscatoria para la central, infringirían los mismos el debido procedimiento. Y prueba de esta índole no ha sido ofrecida ni aquí ni en ninguno de dichos casos.

En su alegato de réplica los peticionarios afirman que el operador de un molino ". . . tiene que hacer los pagos fijados por el art. 6 ya opere con ganancia o sin ella,—ya se

merme su capital o no—puédanse sostener o no los molinos de que el colono depende para elaborar su producto—e independientemente de precio en el mercado de su participación en los azúcares, con la que tiene que hacer los pagos." (⁶) El récord no contiene prueba de que el impacto del art. 6 resultaría en pérdidas para los peticionarios, en merma de su capital, o en el cierre de sus molinos. No tenemos derecho a especular que la Ley núm. 426 tendría tales efectos económicos en ausencia de prueba a ese efecto. Son los peticionarios quienes deben demostrar que el art. 6, al aplicársele a ellos, es confiscatorio. No lo han hecho. Véanse *Pacific States Co.* v. *White*, 296 U. S. 176, 185–6; *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152–54; *Clark* v. *Paul Gray, Inc.*, 306 U. S. 583, 594; *Kovacs* v. *Cooper*, 336 U. S. 77, 89–95, opinión concurrente del Juez Frankfurter; *Dennis* v. *United States*, 341 U. S. 494, opinión concurrente del Juez Frankfurter a las págs. 525 *et seq.*; *Salsburg* v. *Maryland*, 346 U. S. 545, 553; *Postley* v. *Tesorero*, 75 D.P.R. 874, 896, escolio 13. (⁷)

También arguyen los peticionarios en su alegato que "Sería igualmente lógico disponer que el elaborador tiene que recoger la caña en el cañaveral, o que tiene que cortarla, o que tiene que cultivar y pagar por el abono." Toda vez que la Ley núm. 426 no contiene tales disposiciones, no vemos cómo dicho argumento nos pueda obligar a resolver que las disposiciones que realmente contiene el art. 6(*a*), en relación al

---

(⁶) Al así argumentar, aparentemente los peticionarios admiten lo que apuntamos en el caso de *Roig*, resuelto en el día de hoy—el colono "depende para elaborar su producto" del molino.

(⁷) Éste fué un caso en el que la resolución de la Junta tuvo un impacto individual sobre los peticionarios. Tenían éstos por tanto derecho a obtener y obtuvieron una vista cuasijudicial ante la Junta sobre la controversia que nos ocupa. *Eastern Sugar Associates* v. *Junta Azucarera*, núm. 3, resuelto en el día de hoy. No se aprovecharon en esta vista de la oportunidad de demostrar, si podían, mediante testimonio que al serle aplicada a ellos, la disposición del art. 6(*a*) en cuanto al servicio de grúa, al leerse conjuntamente con el resto de la Ley núm. 426, les resultaría en pérdidas o ganancias insuficientes. *Antonio Roig, Sucrs.* v. *Junta Azucarera*, resuelto en el día de hoy.

servicio de grúa y de personal, lo hacen confiscatorio. Véase *Ballester* v. *Tribunal de Apelación,* 61 D.P.R. 474, 503, 505, confirmado en 142 F.2d 11 (C.A. 1, 1944), certiorari denegado en 323 U. S. 723.

La Asamblea Legislativa por medio de la Ley núm. 426 reglamentó la industria azucarera en Puerto Rico en su totalidad. Fué un enfoque válido. *Antonio Roig, Sucrs.* v. *Junta Azucarera,* resuelto en el día de hoy. Por consiguiente, no podemos aceptar el argumento de que los peticionarios se dedican solamente a la elaboración o fase industrial del negocio azucarero, y que exigirles que provean servicio de grúa en un sitio de entrega es obligarles a hacer un regalo a una persona que se dedica a una rama diferente de la industria.

Nada encontramos en los casos citados por los peticionarios que nos obligue a resolver que la disposición del art. 6 relativa al servicio de grúa en los sitios de entrega infringe la cláusula del debido procedimiento local o la federal.(8) Por los motivos expuestos (1) en esta opinión, (2) en el caso de *Antonio Roig, Sucrs.* v. *Junta Azucarera,* resuelto en el día de hoy, y (3) en el caso de *Eastern Sugar Associates* v. *Junta Azucarera,* núm. 3, resuelto en el día de hoy, no encontramos ninguna falla constitucional en dicha disposición.

*Se confirmará la resolución de la Junta Azucarera con costas y gastos a los peticionarios de conformidad con el art. 33 de la Ley núm. 426.*

Los Jueces Asociados Sres. Ortiz y Sifre no intervinieron.

---

(8) Los peticionarios, al argumentar sobre constitucionalidad, descansan en los casos de *Loan Association* v. *Topeka,* 87 U. S. 655; *Lowe* v. *Harris,* 112 N. C. 472 (1893), según aparece en 22 L.R.A. 379, 381; *Missouri Pacific Railway* v. *Nebraska,* 164 U. S. 403, 417; *Thompson* v. *Consolidated Gas Co.,* 300 U. S. 55, 80; *Ex parte Goodrich,* 160 Cal. 410, 420 (1911); Gt. *Northern Ry.* v. *Minnesota,* 238 U. S. 340; *In re Opinion of the Justices,* 14 N.E.2d 392 (Mass., 1938); *Louisville and Nashville R.R. Co.* v. *Stock Yards Co.,* 212 U. S. 132; *State* v. *Harris,* 6 S.E. 2d 854 (N.C., 1940). Este último, y los demás casos estatales citados, no son aplicables y de cualquier modo no nos obligan.