Plata Sugar Company, Inc., peticionaria, v. Junta Azucarera de Puerto Rico, recurrida.

Número 16.
*Sometido:* 3 de abril de 1959. *Resuelto:* 7 de junio de 1961.

*Fiddler, González & Nido,* abogados de la peticionaria; *Alejandro Romanace,* abogado de la recurrida; *José Luis Cancio,* abogado del colono.

EL JUEZ ASOCIADO SEÑOR SERRANO GEYLS emitió la opinión del Tribunal.

Nos compete fallar en este recurso sobre una cuestión que surge del art. 6 de la Ley Azucarera (5 L.P.R.A. sec. 375). Bernardo Méndez Jiménez cultiva varias fincas de cañas ubicadas en el barrio Hato Arriba del Municipio de San Sebastián y una en el Barrio Maravilla Este de Las Marías y se encarga él mismo de transportar las cañas al molino por medio de camiones. En la zafra de 1954 molió las cañas de todas esas fincas en el molino de Plata Sugar Co., Inc., peticionaria en este recurso. El 28 de octubre de ese año, Méndez sometió a la Junta Azucarera una notificación de cambio de molienda para la zafra de 1955, de Central Plata a Central Igualdad. Expresó su intención de moler el cuarenta por ciento de sus cañas en Central Igualdad y el sesenta por ciento restante en Central Plata e informó que las cañas se cultivaban en sus fincas de los Barrios Maravilla Este de Las Marías y Hato Arriba de San Sebastián. Se notificó la solicitud a la Central Plata y ésta no se opuso. La Junta aprobó el cambio.

Más tarde surgió una controversia entre Méndez y la Central Plata sobre la manera de computar la compensación por arrastre y arrimo que estipula la Ley Azucarera. Méndez alegaba que él podía enviarle cañas de cualesquiera de sus fincas a la Central y que ésta tenía que pagarle la compensación según la distancia recorrida por dichas cañas. La Central sostenía que Méndez debía enviarle cañas de las fincas más cercanas al molino y liquidarle la compensación sobre esa base. Finalmente, las partes acordaron que Méndez plantearía el asunto ante la Junta Azucarera y que mientras tanto la Central pagaría la compensación a base de un "promedio ponderado" (weighted average) de las distancias y producción de todas las fincas. Méndez acudió ante la Junta, y luego de los trámites ordinarios, ésta ordenó a la Central pagar la compensación de acuerdo con la distancia

recorrida por las cañas desde las fincas de origen hasta el batey del molino. Más tarde denegó una solicitud de reconsideración. (¹)

A solicitud de Plata Sugar Co., Inc., expedimos un auto de revisión de conformidad con las disposiciones pertinentes de la Ley Azucarera. Luego suspendimos la ejecución de la orden de la Junta, con el asentimiento de todas las partes y la prestación de la correspondiente fianza.

En sus conclusiones sobre los hechos la Junta dijo lo siguiente:

"2. Las distancias a que se encuentran dichas fincas del batey de Central Plata de acuerdo con el Exhibit A de la querellada, son las siguientes:

| Fincas | Kilómetros |
|---|---|
| a. Villa Luz | 3. 52 |
| b. Márquez | 2. 88 |
| c. Baldomero | 2. 24 |
| d. Cabán | 4. 32 |
| e. Maravilla | 14. 72 |

"3. Central Plata estimó el pago por concepto de arrastre y arrimo de dicho colono a base de un promedio de 7.92 kilómetros y le liquidó al colono a razón de ocho kilómetros (T. E. p. 10) que equivale a cincuenta y cinco centavos por tonelada de caña como pago provisional.

"4. No hay disputa en cuanto a las distancias a que quedan las salidas naturales de las fincas arriba mencionadas del batey de la Central Plata.

"5. El colono Bernardo Méndez Jiménez molió parte de las cañas cultivadas en esas fincas en Central Igualdad.

"6. La finca del colono Bernardo Méndez Jiménez más cercana de la Central Plata donde se cultivan cañas que se muelen en las dos centrales, queda a 4 kilómetros de Central Plata y a treinta y seis kilómetros de Central Igualdad.

"7. La finca del colono Bernardo Méndez Jiménez más lejana de Central Plata donde se cultivan cañas que se muelen en las dos centrales queda a quince kilómetros de Central Plata y a cincuenta y cinco kilómetros de Central Igualdad.

---

(¹) Uno de los tres miembros de la Junta disintió.

"8. La Central Plata estimó que la producción total del colono Bernardo Méndez Jiménez en las fincas arriba mencionadas sería 6,850 toneladas de caña de azúcar a producirse en un área total de 249.15 cuerdas.    (Véase Exhibit A de Central Plata.)

"9. La diferencia estimada en el pago por concepto de arrastre y arrimo entre el sistema de promedio alegado por Central Plata y el sistema impuesto por la Ley equivale a $690.00. (Véase T.E. p. 21, 22).

"10. La Junta toma conocimiento oficial de que en el (Crop Marketing Compliance Report) Sumario de Liquidaciones de Cañas de Colonos para la zafra de 1955, sometido a esta Junta por Central Plata, el colono Bernardo Méndez Jiménez molió en Central Plata 4,228.2 toneladas de caña de azúcar."

En sus conclusiones de derecho, la Junta rechazó una alegación de inconstitucionalidad del art. 6 hecha por la Central; sostuvo, además, que dicho artículo no autorizaba el método de "promedio ponderado" que propugnaba la peticionaria y sí únicamente el pago a base de las distancias realmente recorridas por las cañas.

[ ] Ante nos la peticionaria sostiene que es incorrecta la interpretación del art. 6 que hace la Junta; que de no serlo el art. 6 sería inconstitucional; y que la Junta dictó su orden sin tener prueba de la procedencia de las cañas. Veamos.

Dispone el art. 6:

"Para el arrastre y arrimo de las cañas de los colonos, regirán las siguientes cláusulas y condiciones:

(a) La central podrá proveer los medios de transportación para las cañas de sus colonos desde la finca del colono hasta la central, y cuando así los provea, compensará al colono con siete y medio (7-½) centavos por tonelada de caña entregada, por concepto de arrimo; *Disponiéndose*, que si durante la zafra de 1950 alguna central hubiese pagado una suma superior por este concepto, este último será el tipo que regirá para dicha central. En caso de que la central no provea los referidos medios de transportación, vendrá obligada a compensar al colono en la forma y medida más adelante establecida, por la transportación de dichas cañas desde la finca del colono hasta el sitio de entrega designado por la central, ya bien dicha transportación se efectúe

con equipo propio del colono o arrendado por él. La central estará obligada a proveer a todos sus colonos, sin costo alguno para éstos, servicio de grúa y el personal necesario para su operación en cada sitio que la central designe para la entrega de cañas. Cuando se trate de un colono nuevo o uno que desee cambiar de sitio de entrega de las cañas y la central y el colono no se pongan de acuerdo en cuanto al sitio de entrega, la Junta determinará el sitio en que la central deberá recibir las cañas del colono, de entre los designados por la central.

"(b) En los casos en que el colono haga la transportación de sus cañas, la central le compensará a razón de quince (15) centavos básicos por tonelada de caña transportada, por concepto de arrimo, más la cantidad de cinco (5) centavos por tonelada por kilómetro, desde la finca al sitio de entrega, siempre y cuando la distancia a recorrer desde la finca al sitio de entrega sea de medio kilómetro o más; *Disponiéndose,* que el colono tendrá derecho a recibir la compensación básica de quince (15) centavos aunque la distancia a recorrer desde la finca al sitio de entrega sea menor de medio kilómetro. La distancia, a los efectos de esta compensación, se determinará desde la salida normal o natural de la finca del colono en donde se cortó la caña hasta el sitio de entrega designado por la central; si al determinarse el peso y la distancia en el arrastre y arrimo de las cañas resultare una fracción de kilómetro o tonelada, se pagará la compensación en ambos casos por la fracción proporcionalmente.

"(c) En los casos en que la central haya venido usando vías portátiles para el arrastre de las cañas de un colono, la central vendrá obligada a suplir al colono, sin costo alguno para éste, dichas vías portátiles y material rodante necesarios, y asimismo vendrá obligada a pagar al colono cinco centavos (5¢) por tonelada de caña por concepto de arrimo. La central podrá descontinuar la práctica de suplir directamente, o a través de cualquier entidad subsidiaria, agente o contratista, vías portátiles a sus colonos, siempre que obtenga la aprobación previa de la Junta para así hacerlo. La Junta tendrá facultad para ordenar a cualquier central que descontinúe el uso de cualquier sistema de arrastre que a juicio de la Junta resulte perjudicial a los intereses de los colonos o de la industria.

"(d) El pago de la compensación anteriormente provista por concepto de arrastre y arrimo deberá efectuarse por la central semanalmente.

"(e) Las centrales serán responsables a los colonos de las cañas de éstos desde el momento en que las reciban en el sitio de entrega designado por la central, excepto en casos de fuerza mayor, o fuera del control de la central.

"La central en ningún caso vendrá obligada a pagar más de un dólar por concepto de arrastre y arrimo.

"En lo que se refiere a las cañas de la isla de Vieques que se transporten a Puerto Rico, se mantendrá, en cuanto a arrastre y arrimo, lo dispuesto por la Comisión de Servicio Público para la zafra de 1951, hasta tanto la Junta previa audiencia de las partes dispusiere algo en contrario, que será lo que regirá."

Es evidente que la transcrita disposición contiene una detallada y cuidadosa reglamentación de una materia muy importante en la industria azucarera. Cubre en detalle los casos en que la central provee los medios de transportación y aquéllos en que los provee el colono, las compensaciones exactas que deben pagarse, las maneras de computarlas y pagarlas, el límite máximo de ellas, las reglas especiales para el uso de vías portátiles, las responsabilidades de las centrales y los colonos, y las facultades de la Junta en diversas situaciones. El párrafo (b) gobierna el problema planteado en el presente recurso. Cuando el colono se encarga de la transportación de sus cañas tiene derecho a recibir de la central por concepto de arrimo una compensación básica de quince centavos por tonelada de caña transportada, y una compensación adicional de cinco centavos por tonelada por kilómetro "desde la finca al sitio de entrega, siempre que la distancia a recorrer desde la finca al sitio de entrega sea de medio kilómetro o más . . ." A renglón seguido la ley provee meridianamente la fórmula para hacer el cómputo: "La distancia, a los efectos de esta compensación, se determinará desde la salida normal o natural de la finca del colono en donde se cortó la caña hasta el sitio de entrega designado por la central. . ."

No existe dificultad alguna en aplicar esa medida cuando se trata de un colono que cultiva una sola finca. El art. 3

de la Ley Azucarera (*Leyes* de 1951, págs. 1139, 1143; 5 ·L.P.R.A. sec. 372) impone a la central la obligación de moler las cañas de un colono que lo hubiese sido de ella en cualesquiera de los tres años anteriores, y la de cualquier colono nuevo si tiene suficiente capacidad de molienda para hacerlo. Como cuestión puramente de ley, y si existe esa capacidad, cualquier central está obligada a moler las cañas de cualquier colono no importa donde ubique su finca, y a pagar las debidas compensaciones de arrastre y arrimo.

La ley, sin embargo, no se bordó en paño liso. La considerable experiencia legislativa y administrativa(²) acumulada a través de los años indicaba a los legisladores que había poderosos factores económicos y geográficos que en gran medida habrían de condicionar la libre selección del colono. Entre ellos cuentan, sin duda, la eficiencia del molino, las distancias entre la finca y la central, la accesibilidad de los caminos, las facilidades de transportación y su costo, las fechas y duración de la molienda, los turnos de entrega establecidos por la central, las condiciones del tiempo, las relaciones contractuales y de otra índole entre central y colono, etc. No había, pues, que pensar que un colono de la zona este del país fuera, por ejemplo, a enviar sus cañas a un molino de la zona oeste. Para mayor certeza la ley añadió otro factor limitativo. En el citado art. 6 se dispuso expresamente que "La central en ningún caso vendrá obligada a pagar más de un dólar por concepto de arrastre y arrimo". Como la compensación legal por tonelada es de quince centavos por arrimo y de cinco centavos por kilómetro de arrastre, el máximo de un dólar tiene el efecto de desalentar el envío de cañas a ser molidas a una central cuando el sitio de entrega está ubicado a una distancia mayor de diecisiete

---

(²) Ninguna industria ha sido más extensamente reglamentada en interés del público que el negocio de azúcar en Puerto Rico". *A. Roig, Sucrs.* v. *Junta Azucarera*, 77 D.P.R. 342, 348 (1954). Las páginas 348 a 352 de esa sentencia describen la experiencia anterior a la ley de 1951. Examínese, además, el Reglamento sobre Compañías Azucareras aprobado por la Comisión de Servicio Público el 29 de junio de 1946.

kilómetros de la finca de origen. La central, desde luego, está en la completa libertad de ofrecer compensaciones mayores a los colonos.

La peticionaria, sin embargo, pretende sostener que ese cuadro económico y legal cambia cuando el colono cultiva varias fincas. Nos dice que en tal caso el colono no tiene "el derecho a su antojo a escoger las fincas más lejanas para enviar cañas a la factoría y obligar a ésta a pagarle por las distancias realmente recorridas por dichas cañas".([3]) Debe, a su juicio, sustituirse ese derecho del colono por una norma que le obligue a enviar a la central las cañas de las fincas más cercanas al molino, o por lo menos, por otra que permita utilizar una fórmula de "promedio ponderado". No obstante, la peticionaria no nos somete un solo fundamento de ley o economía para sostener su interpretación. La búsqueda y reflexión nuestras tampoco lo han producido. Lo que en realidad se pretende es modificar la medida clara y específica de la ley por una nueva fórmula, aplicable sólo a los colonos que cultivan más de una finca, y que tendría el efecto de conceder a las centrales, en esos casos, la facultad de determinar de cuáles fincas han de proceder las cañas que ellas deben moler. Ese resultado es contrario al derecho del colono de llevar sus cañas a la factoría donde más le convenga, y a la obligación de la central de molerlas si tiene capacidad para hacerlo. Serviría para revivir en parte el anterior sistema de zonas de producción([4]) que descartó la ley actual, pero empeorado por ser entonces la central, y no un organismo del gobierno, la que haría las asignaciones de molienda. No podía la Junta, ni puede este Tribunal, sancionar ese resultado.

([3]) Como cuestión real, el colono no escogió las fincas más lejanas, sino que le envió cañas de todas sus fincas a la Central. La prueba demuestra también, como ya vimos, que las fincas del colono quedaban todas más cerca de Central Plata que del otro molino (Central Igualdad) donde el colono también envió cañas.

([4]) Arts. 4 y 42 de la Ley Núm. 221 de 12 de mayo de 1942 (*Leyes,* pág. 1177).

Fallamos, por tanto, que la Junta actuó correctamente al resolver que un colono que cultiva varias fincas tiene el derecho, sujeto a las disposiciones del art. 3 de la Ley Azucarera, de escoger las fincas de las cuales ha de enviar cañas a una central y que ésta tiene la obligación de molerlas y de pagarle, hasta el límite máximo de un dólar, la compensación de arrastre y arrimo que ordena el art. 6 a base de la distancia realmente recorrida por las cañas "desde la salida normal o natural de la finca . . . hasta el sitio de entrega designado por la central".

■ Los reparos de índole constitucional que la peticionaria aduce contra esa norma son obviamente insustanciales. (5)   Tienen por base una jurisprudencia inaplicable por sus hechos o por fundarse en un concepto de la economía y de las funciones del gobierno decididamente *passé*.   La validez constitucional del art. 6 ha sido sostenida repetidamente por sentencias de este Tribunal.   En *A. Roig Sucrs.* v. *Junta Azucarera*, supra, págs. 346–358, por voz del Juez Presidente señor Snyder, hicimos un cuidadoso análisis de todo el problema y a la luz de vitales factores históricos, económicos y sociales, sostuvimos la validez tanto de la ley como de su art. 6.   Confirmamos ese resultado en *Eastern Sugar Associates* v. *Junta Azucarera*, 77 D.P.R. 358, 371 (1954) ; *Eastern Sugar Associates* v. *Junta Azucarera*, 77 D.P.R. 374, 383–385 (1954) ; y *Mayagüez Sugar Co.* v. *Junta Azucarera*, 79 D.P.R. 423, 424–425 (1956).   En igual sentido se ha pronunciado la jurisdicción federal.   *Antonio Roig Sucrs.* v. *Sugar Board of Puerto Rico*, 235 F.2d 347, 353–354 (1956) ; cert. denegado 352 U.S. 928 (1956).   Basta decir, en contestación sumaria a la alegación de la central, que ella no ha añadido nada nuevo a los argumentos contra el art. 6 que fueron examinados y rechazados en la citada jurispru-

---

(5) Argumenta que por un lado la ley obliga a la central a moler las cañas del colono y por otro le permite a éste controlar el factor de distancia entre la finca y el sitio de entrega, y en su consecuencia, reducir la cuantía de la compensación de la central, y que ese plan es por tanto, arbitrario, caprichoso e irrazonable.

dencia, y que, además, en modo alguno ha probado que la aplicación de dicho artículo a las circunstancias específicas de este caso sea irrazonable, arbitraria o caprichosa o que resulte en una confiscación de su propiedad o le obligue a funcionar con pérdidas o con ganancia insuficiente.

 Carece también de méritos la alegación que imputa a la Junta el error de ordenar el pago al colono sin que pudiera determinarse la procedencia de las cañas enviadas por él. La Junta recibió abundante evidencia oral y documental sobre dicho extremo, en dos vistas, una de ellas dedicada exclusivamente a ese fin. Hay suficiente prueba en los autos y en el Exhibit A de la propia peticionaria para sostener la orden de la Junta y realizar los cómputos necesarios.

*Se confirmará la resolución de la Junta Azucarera con costas y gastos a la peticionaria de conformidad con el art. 33 (5 L.P.R.A. sec. 402) de la Ley Azucarera.*