MARIO MERCADO E HIJOS, peticionaria, *v.* JUNTA AZUCARERA DE PUERTO RICO, recurrida; ASOCIACIÓN DE PRODUCTORES DE AZÚCAR, ETC., peticionarias, *v.* JUNTA AZUCARERA DE PUERTO RICO, recurrida; CENTRALES CAMBALACHE y PLAZUELA (AUTORIDAD DE TIERRAS DE PUERTO RICO), recurrentes, *v.* JUNTA AZUCARERA DE PUERTO RICO, recurrida.

*Números:* JA-66-1,     *Resueltos:* 27 de marzo de 1968
JA-66-2,
JA-66-3

*Pedro M. Porrata* y *Charles R. Cuprill,* abogados de Mario Mercado e Hijos; *Fiddler, González & Rodríguez, Miguel Hernández Colón, Francisco M. Susoni, Pablo Cancio* y *Salvador E. Casellas,* abogados de la Asociación de Productores de Azúcar; *McConnell, Valdés & Kelley* y *Ramón Morán Loubriel,* abogados de C. Brewer Puerto Rico, Inc.; *Eduardo Díaz Porto,* abogado de la Central San Vicente, Inc., y de la Asociación de Productores de Azúcar; *José Alberty Orona, Miguel A. Gierbolini Febus, Daniel A. Cabán Castro, Margarita García Santiago* y *Juan Marín Hernández,* abogados de las centrales Cambalache y Plazuela; *Lydia F. Marcos,* abogada de la recurrida; *J. B. Fernández Badillo, Procurador General,* y *Adaljisa Díaz de Collazo, Procuradora General Auxiliar,* abogados del Estado Libre Asociado de Puerto Rico.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

La Asociación de Productores de Azúcar de Puerto Rico, Mario Mercado e Hijos y la Autoridad de Tierras, empresarios de centrales azucareras, impugnan la resolución de la Junta Azucarera de Puerto Rico de 21 de julio de 1965, que, con vista de la eliminación del máximo de un dólar que hasta entonces había prevalecido por ley, les ordenó a pagar a los colonos la compensación por arrastre y arrimo para las zafras de 1963 y 1964 sin limitación alguna por razón de distancia recorrida. Conforme a estimados de la Junta, ello representa el pago adicional por las centrales de $836,-031.58 para la zafra de 1963 y de aproximadamente $809,565 para la de 1964.

I

Al aprobarse en 1951 la Ley Azucarera de Puerto Rico, Ley Núm. 426 de 13 de mayo de 1951 (Leyes, pág. 1139), la Asamblea Legislativa estableció específicamente en su Art. 6 las condiciones para el arrastre y arrimo de las cañas de los colonos. Para el caso en que la central no proveía los medios de transportación desde la finca del colono hasta el molino, dispúsose que:

"(b) En los casos en que el colono haga la transportación de sus cañas, la central le compensará a razón de quince (15) centavos básicos por tonelada de caña transportada, por concepto de arrimo, más la cantidad de cinco (5) centavos por tonelada por kilómetro, desde la finca al sitio de entrega, siempre y cuando la distancia a recorrer desde la finca al sitio de entrega sea de medio kilómetro o más; *Disponiéndose,* que el colono tendrá derecho a recibir la compensación básica de quince (15) centavos aunque la distancia a recorrer desde la finca al sitio de entrega sea menor de medio kilómetro. La distancia, a los efectos de esta compensación, se determinará desde la salida normal o natural de la finca del colono en donde se cortó la caña hasta el sitio de entrega designado por la central; si al determinarse el peso y la distancia en el arrastre y arrimo de las cañas resultare una fracción de kilómetro o tonelada, se pagará la compensación en ambos casos por la fracción proporcionalmente."

Como una limitación a la compensación que la central venía obligada a satisfacer por este concepto el inciso (e) decía que:

"(e) .  .  .  .  .  .  .  .

La central en ningún caso vendrá obligada a pagar más de un dólar por concepto de arrastre y arrimo.

.  .  .  .  .  .  . ."

Once años después, mediante la Ley Núm. 54 de 19 de junio de 1962 (Leyes, pág. 127), se enmendó el inciso (e) del Art. 6, 5 L.P.R.A. sec. 375, eliminándose lo relativo al pago máximo de un dólar, y se incorporó la disposición que se transcribe a continuación que trasladó a la Junta Azucarera la facultad para establecer la compensación por arrastre y arrimo: ([1])

"No obstante lo dispuesto por este artículo, la Junta, previa audiencia de las partes, podrá aumentar la compensación fijada por concepto de arrastre y arrimo a ser pagada por la central al

---

([1]) Al explicar los propósitos de la legislación la Comisión de Agricultura del Senado informó que "El propósito de este proyecto es que sea la propia Junta la que entienda con la compensación a pagarse a los colonos por el arrastre y arrimo de sus cañas. Actualmente la compensación está fijada por ley." *Diario de Sesiones,* Vol. 15, T. 3, pág. 1147.

colono, que será lo que regirá y así mismo [*sic*] dicha Junta podrá fijar la cantidad máxima que en cada caso la central vendrá obligada a pagar por concepto de arrastre y arrimo."

En 25 de marzo de 1964 la Junta Azucarera tomó el acuerdo de celebrar vistas públicas a los fines de considerar una solicitud de la Asociación de Agricultores de Puerto Rico para que se aumentara la compensación por arrastre y arrimo a los colonos que personalmente efectuaban la transportación de sus cañas desde sus fincas al sitio de entrega a la central de 15 centavos a 24 centavos por tonelada de caña transportada y de 5 centavos a 8 centavos por tonelada de caña por cada kilómetro recorrido.(²)

Luego de haber tenido lugar varios incidentes preliminares que no es necesario reseñar, la Asociación de Productores de Azúcar, en 18 de mayo de 1964, presentó una petición para que se fijara una cantidad máxima de un dólar a la compensación a pagarse a los colonos por arrimo y arrastre. Esta petición se consideró conjuntamente con la presentada por la Asociación de Agricultores. Se celebraron varias vistas durante las cuales tanto los colonos como las centrales ofrecieron evidencia testifical y documental.

En 26 de febrero de 1965 la Junta dictó una extensa resolución declarando sin lugar la petición de la Asociación de Agricultores de Puerto Rico fundándose en que no se había establecido que los colonos, a pesar de que hubieran tenido que asumir costos de transportación más altos, recibieran un pago inadecuado por sus cañas o sufrieran pérdidas o tuvieran un rendimiento insuficiente como productores de caña.(³)

---

(²) Aparentemente la solicitud original de la Asociación de Agricultores se formuló informalmente. Luego se reprodujo mediante una petición escrita de fecha 1 de abril de 1964.

(³) El criterio aplicado por la Junta aparece expuesto en las siguientes palabras de la resolución: "Resumiendo, la Junta debe considerar bajo una base integral si procede o no un aumento en la compensación de arrastre y arrimo determinando si los aumentos en la participación

En cuanto a la petición de la Asociación de Productores de Azúcar de Puerto Rico para que se fijara una compensación máxima, la Junta adoptó la Regla Núm. 11 determinando una compensación máxima de un dólar para regir desde la zafra de 1963.[4]

La Regla Núm. 11 no fue aprobada por el Gobernador de Puerto Rico.[5] Como consecuencia de ello, la Junta Azucarera mediante resolución de fecha 21 de julio de 1965 ordenó a las centrales que procedieran a pagar a los colonos

---

mínima de los colonos por efecto de reducciones en gastos de embarque y mercadeo y aumento en el bono de mieles compensa o no los aumentos en costo de transportación que ha tenido el colono siempre considerando además que la central no está obligada por ley a cubrir el costo total de esa transportación y menos aún en forma directa."

[4] En la parte pertinente dice la resolución:

"La Ley 54 de 19 de junio de 1962 enmendó el inciso (e) del Art. 6 de la Ley Azucarera eliminando el tope de $1 que las centrales deben pagar como compensación a sus colonos por concepto de arrastre. Es de singular importancia la consideración de los efectos de dicha enmienda en su aplicación a la zafra de 1963. Al aplicarse a la zafra de 1963 dicha ley resulta en un aumento en la compensación a solamente aquellos colonos que transportan sus cañas a una distancia mayor de 17 kilómetros. El aumento por lo tanto no es uniforme y hemos explicado que la Ley 426 de 1951 exige el método de participaciones uniformes para los colonos. Tampoco es razonable porque a medida que la distancia aumenta los costos de transportación necesariamente tienen que ser menores ya que los costos fijos se distribuyen. Además, el Art. 3 de la Ley Azucarera (5 L.P.R.A. 372) obliga a las centrales a moler las cañas de los colonos sin que puedan rehusar molerlas debido a que su procedencia lejana le imponga una condición más onerosa. (Plata Sugar Co. Inc. v. Junta Azucarera 1961, 82 D.P.R. 866). Antes de la enmienda, la distancia de más de 17 kilómetros no podía aumentar el mínimo de $1 por tonelada kilómetro.

El poder que le da la Ley 54 de 1962 a la Junta para establecer un límite al kilometraje y/o al tonelaje de caña que deba considerar para determinar una compensación máxima que como mínimo podrá pagarse a los colonos constituye la salvaguardia constitucional de la ley.

*Por lo tanto, el Artículo 6 sin que disponga un máximo mínimo en la compensación por arrastre y arrimo resulta inaplicable constitucionalmente.* Para corregir su inconstitucionalidad la Junta puede fijar un máximo con efecto retroactivo.

.     .     .     .     .     .     ."

[5] Aparentemente el rechazo ejecutivo obedeció al efecto retroactivo a zafras de 1963 y 1964 que se le dio a la mencionada regla.

la compensación correspondiente de arrastre y arrimo para las zafras ya transcurridas de 1963 y 1964, *sin limitación alguna por razón de distancia recorrida* y que archivaran las constancias correspondientes de haber compensado en la forma indicada. Las centrales recurrentes solicitaron inmediatamente la reconsideración de esta resolución aduciendo, en sustancia, que (a) se les privaba de su propiedad sin el debido proceso de ley porque en su aplicación era confiscatoria, onerosa, irrazonable y arbitraria, no sólo por los perjuicios económicos que se les causaban, sino porque en efecto dejaba al arbitrio exclusivo de los colonos la determinación del monto a pagarse por tal concepto, considerada la obligación de moler las cañas que les imponía el Art. 3 de la Ley Azucarera; y, (b) la determinación fijando un límite máximo fue adoptada dentro de un procedimiento de naturaleza cuasi judicial, aunque se denominó Regla 11, lo que hacía innecesaria la aprobación ejecutiva, y no habiendo sido impugnada por los colonos estaba en vigor. Concluían solicitando se les permitiera comparecer a presentar prueba sobre el perjuicio económico que se les causaba y se les concediera un término razonable para radicar un memorándum sobre las cuestiones de derecho planteadas. En 11 de septiembre de 1965 las centrales presentaron un informe escrito en apoyo de la moción de reconsideración suscrito por el señor Fernando Chardón en el cual se discute el impacto económico de la resolución del 21 de julio, con acopio de extensa información para sustentar la posición adelantada de que la compensación sin límite máximo "obliga a las centrales a moler cañas con pérdidas ya que les impone la obligación de pagar costes de arrastre exhorbitantes [*sic*] en casos de cañas distantes, impidiéndoles al mismo tiempo el negarse a molerlas." En 7 de octubre solicitaron además que (a) se hiciera formar parte del récord la resolución dictada el 26 de febrero anterior así como el récord taquigráfico de las vistas que culminaron en la adopción de la Regla 11, y (b) que se tomara

conocimiento oficial del uso y costumbre en la industria de otorgar contratos de molienda por dos o tres años. Parecidos planteamientos se hicieron por Mario Mercado e Hijos, la Autoridad de Tierras y la Central San Vicente.

Mediante resolución de 29 de diciembre de 1965 se denegó la reconsideración solicitada. [6] Aunque la Junta reconoce que originalmente "soslayó el planteamiento de inconstitucionalidad accediendo a fijar un límite en la compensación máxima", sostuvo que "los argumentos aducidos por las centrales en apoyo de sus contenciones no han convencido a la Junta de que la orden dictada por ésta el 21 de julio de 1965 . . . hubiese tenido efectos confiscatorios, irrazonables y arbitrarios durante los años 1963 y 1964, años a que se contrae la aplicación de dicha orden."

Contra esta resolución de la Junta y su negativa a reconsiderar recurrieron las centrales ante nos reproduciendo sustancialmente los mismos planteamientos de impugnación que habían formulado ante la Junta. [7] Precaria sería la posición de las recurrentes si la resolución de este recurso dependiera exclusivamente de esos planteamientos. Sobre la privación de propiedad por ser la orden confiscatoria, véanse, *Eastern Sugar* v. *Junta Azucarera,* 77 D.P.R. 374 (1954), conf. en 235 F.2d 347 (1956), y casos allí citados; sobre la naturaleza de la orden, véanse, *Eastern Sugar Associates* v. *Junta Azucarera,* 77 D.P.R. 374, 385–9 (1954) y *Godreau & Co.* v. *Com. Servicio Público,* 71 D.P.R. 649, 655–6 (1950).

## II

■ De la extensa relación de los procedimientos que precede aparece que la resolución de la Junta Azucarera orde-

---

[6] La resolución fue adoptada por mayoría de los miembros de la Junta; uno de los miembros asociados presentó un voto disidente.

[7] Se presentó además una cuestión de inconstitucionalidad por indebida delegación de poderes, pero en la vista oral celebrada se desistió de la misma.

nando el pago de compensación por arrimo sin limitación alguna obedeció a que, al devolverse la Regla 11 sin la aprobación ejecutiva, entendió que la ley mandatoriamente exigía tal resultado por haberse eliminado la disposición del inciso (e) del Art. 6 que fijaba el máximo de un dólar. Consideró que la actuación legislativa vedaba todo otro curso de acción, aun cuando en todo momento estaba advertida del problema constitucional que ello plantearía. Como se verá no es necesario que consideremos el aspecto constitucional ya que la recta interpretación de toda.la situación nos lleva a la conclusión de que la eliminación del máximo de un dólar presupone que previamente se aumente la compensación básica de 15¢ y 5¢ que originalmente se fijó en 1951 por la Ley Núm. 426; y, habiéndose mantenido la compensación básica para arrastre y arrimo, el límite máximo de un dólar debe estimarse vigente para las zafras de 1963 y 1964. En ese sentido damos cumplimiento a nuestra obligación de "evitar interpretar un estatuto en forma tal que lleve a un resultado irrazonable", *Colonos de Santa Juana* v. *Junta Azucarera*, 77 D.P.R. 392, 396 (1954).

Juicioso es repetir ciertos principios fundamentales que informan la aprobación de la Ley Azucarera. Vitales factores históricos, económicos y sociales requirieron la reglamentación de la industria en su fase fabril para evitar el desbalance económico que había existido en perjuicio de los colonos; de ahí la intervención activa del Estado para lograr un ponderado y sereno equilibrio entre éstos y las centrales.[8] Corolario necesario es una distribución ordenada de

---

[8] *Central Monserrate, Inc.* v. *Junta Azucarera*, 83 D.P.R. 109 (1961), en relación con los gastos de embarque y mercadeo; *Plata Sugar Co.* v. *Junta*, 82 D.P.R. 866 (1961), sobre compensación por arrastre y arrimo; *South P.R. Sugar Co.* v. *Junta*, 82 D.P.R. 847 (1961), sobre la libertad de molienda de los colonos; *Mayagüez Sugar Co.* v. *Junta Azucarera*, 78 D.P.R. 887 (1956), sobre la entrega de cañas de variedades inferiores; *Colonos de Santa Juana* v. *Junta Azucarera*, 77 D.P.R. 392 (1954), sobre prestación de servicio de grúa a colonos; *Eastern Sugar Associates* v. *Junta Azucarera*, 77 D.P.R. 374 (1954), sobre la liquidación de la parti-

los costos y beneficios entre ambos, pero "no pudo ser el propósito legislativo que esta ley beneficiase a los colonos al extremo de afectar adversamente toda la economía de la industria imponiéndose a las centrales obligaciones irrazonablemente onerosas." *Arroyo Merino* v. *Junta Azucarera*, 89 D.P.R. 622, 637 (1963). Tampoco a los fines de determinar su verdadero significado y sus propósitos puede leerse en este caso el Art. 6 aisladamente desconociendo las otras disposiciones de la ley que forman una reglamentación general para enfrentarse a los problemas y condiciones de la industria, *A. Roig, Sucrs.* v. *Junta·Azucarera*, 77 D.P.R. 342, 353 (1954). Nunca antes que ahora cobran mayor vigencia estos principios ante la situación existente en la industria, que podría describirse como vacilante y en estado de zozobra.[9]

■ Como se dice en *A. Roig, Sucrs.* v. *Junta Azucarera*, supra, pág. 356 (1954), la legislación "en términos generales, ha seguido la costumbre y el patrón histórico de la industria azucarera en Puerto Rico al fijar la compensación, *incluyendo gastos de arrastre y arrimo*, que las centrales han sido obligadas a pagar a sus colonos." Una revisión de las leyes anteriores sólo lleva a la inescapable conclusión de que en relación con el arrimo y arrastre de las cañas ha prevalecido un sistema mediante el cual las centrales *han contri-*

cipación de los colonos; *Eastern Sugar Associates* v. *Junta Azucarera*, 77 D.P.R. 358 (1954), sobre la determinación del punto de entrega a los fines de la compensación de arrastre; y *A. Roig, Sucrs.* v. *Junta Azucarera*, 77 D.P.R. 342 (1954), especialmente a las págs. 348 a 352.

[9] Mensaje Especial de 31 de octubre de 1966 del Hon. Roberto Sánchez Vilella, Gobernador de Puerto Rico, a la Asamblea Legislativa sobre la Agricultura, *Diario de Sesiones*, Vol. XX, pág. 11 (1966); Ley Núm. 1 de 6 de diciembre de 1966 (Leyes, pág. 3), para proveer un programa de incentivos y mejoramiento de la industria azucarera, especialmente la exposición de motivos; *Informe sobre la Agricultura de Puerto Rico: Situación y Posibilidades*, Revista de Agricultura de Puerto Rico (1966), Vol. 53, Núms. 1 y 2, págs. 39-64; Asociación de Productores de Azúcar, *Manual of Sugar Statistics* (ed. 1967).

Desde el año 1952 hasta el presente 15 centrales han cesado en sus operaciones; en la actualidad sólo operan 18.

*buido*, pero *no han sufragado totalmente*, los gastos que tales actividades irrogan al colono. Así, la Ley Núm. 112 de 13 de mayo de 1937 (Leyes, pág. 271), no menciona específicamente este asunto, y en su Sec. 7 se limita a disponer que "El colono entregará sus cañas en el sitio y forma que con la central conviniere, y una vez aceptadas en el sitio, la central asumirá la responsabilidad de dichas cañas en cuanto a su transportación al molino", obvia referencia a las cañas que se entregaban por los colonos en los desvíos de ferrocarril para ser transportadas por locomotoras hasta el molino. Ya en 1938, mediante la Ley Núm. 213 de 15 de mayo (Leyes, pág. 428), se enmienda la Sec. 7 para disponer que la central no podría "hacer descuento alguno de las cantidades con que para el arrastre por trucks, carros de bueyes, bestias o vehículos de clase alguna *contribuirá* . . . al colono, *debiendo servir como tipos mínimos los que prevalecieron en la zafra de 1937*." El efecto práctico fue incorporar los tipos que los usos y costumbres de las partes hasta entonces habían elaborado. En 1942, como parte del programa de un nuevo gobierno que profesaba una política económica que consideraba a las centrales azucareras como empresas de servicio público, y como tales sujetas a una estrecha reglamentación por el Estado, se aprueba la Ley Núm. 221 de 12 de mayo de 1942 (Leyes, pág. 1177), que nada provee específicamente respecto a compensación por arrimo y arrastre. No obstante, la Comisión de Servicio Público, organismo bajo cuya jurisdicción se colocaron las centrales, al amparo de los Arts. 21 y 23 de la susodicha ley, fijó las cantidades que por tal concepto las centrales vendrían obligadas a pagar.[10]

---

[10] Transcribimos extensamente la parte pertinente del Art. 12 del Reglamento General para la zafra de 1943–44 para que se compruebe la permanencia que había adquirido y que se reconoció a la fórmula de compensación que discutimos.

"Art. 12.—Las centrales estarán obligadas a pagar a los colonos, por concepto de arrimo y arrastre de cañas hasta la central, las siguientes

Este reglamento no hizo más que incorporar la práctica prevaleciente, arraigada en los usos y costumbres: una cantidad básica de quince centavos por tonelada de caña transportada por concepto de arrimo, más cinco centavos por tonelada por kilómetro recorrido desde la finca del agricultor al sitio de entrega pero con una limitación máxima de un

compensaciones de acuerdo con los métodos especificados de transportar las cañas a las centrales:

1. *Arrastre y arrimo directo en la central:*

(a) Camiones usados por los propios colonos y llenados a mano dentro de la pieza y llevados a la central, *15¢ básicos más 5¢ por tonelada por kilómetro de la finca a la central.*

(b) Carretas tiradas por bueyes y carretas tiradas por tractores, bajo las mismas circunstancias del apartado (a), *15¢ básicos más 5¢ por tonelada por kilómetro,* si la distancia a recorrer es de un (1) kilómetro o más desde la finca a la central.

(c) Vagonetas de la central llenadas dentro de la pieza sobre vías portátiles de la central y llevadas por la central a una vía fija y de la vía a la central; o vagonetas de la central llevadas directamente a la central por vías portátiles. No se pagará cantidad alguna por arrastre y arrimo. Si esas vagonetas y esas vías portátiles pertenecieren al propio colono, entonces deberá pagarse la cantidad de *5¢ por tonelada.*

2. *Arrastre y arrimo combinados a la central:*

(a) Carretas de bueyes de o alquiladas por colonos desde la pieza a una plaza dentro o cercana de la finca, y trasbordo a mano o con grúa a camiones de o alquilados por colonos para llevar la caña a la central; o carretas de tractores de o alquiladas por colonos desde la pieza a una plaza dentro o cercana de la finca, y trasbordo con grúa a camiones de o alquilados por colonos para llevar a la central; la central pagará por este concepto a los colonos *15¢ básicos más 5¢ por tonelada por kilómetro.*

(b) Carretas de bueyes de o alquiladas por colonos desde la pieza a un desvío de la central, y trasbordo a mano o con grúa a vagonetas o vagones de la central, para del desvío transportar hasta la central; o carretas de tractores o vagonetas de o alquiladas por colonos desde la pieza a un desvío de la central, y trasbordo con grúa a vagones de la central, para del desvío transportar hasta la central: la central deberá pagar por este concepto a los colonos *15¢ básicos más 5¢ por tonelada por kilómetro,* si la distancia de la finca al desvío es de un (1) kilómetro o más.

(c) Cañas llevadas sobre caballos desde la pieza a la plaza de la central y en la plaza envagonadas a mano, *15¢ básicos más 5¢ por tonelada por kilómetro,* si la distancia a recorrer es de un (1) kilómetro o más.

(d) Cañas llevadas sobre caballos desde la pieza a un desvío de la central, y trasbordo a mano a vagonetas de la central, y del desvío

dólar. Es ésta la misma fórmula que, como hemos visto, se adopta estutariamente en el Art. 6 de la Ley Núm. 426 de 13 de mayo de 1951 (Leyes, pág. 1139).[11]

Dedúcese pues que la fijación de una cantidad máxima por arrastre y arrimo ha sido siempre parte integrante indispensable de la fórmula de compensación, consecuencia ésta de la práctica de que la central contribuye a pero no satisface totalmente los gastos en que incurre el colono por este concepto.[12] Véanse, Estación Experimental Agrícola, *Estudio Económico Sobre el Arrastre de Caña de Azúcar*

a la central: *15¢ básicos más 5¢ por tonelada por kilómetro*, si la distancia al desvío es de un (1) kilómetro o más.

(e) Carretas de bueyes, carretas de tractores o vagonetas, desde la pieza a una plaza o cargadero, trasbordo con grúa a camiones de o alquilados por colonos para transportar a un desvío común de la central, y trasbordo en el desvío con grúa a vagones de la central para la conducción final a la central: *15¢ básicos más 5¢ por tonelada por kilómetro*, si la distancia del cargadero o plaza en la finca hasta el desvío es de más de (1) kilómetro.

(f) Carretas de bueyes de o alquiladas por colonos desde la pieza a lanchones por río y de éstos por trasbordo a vagones llenados a mano o con grúa en un desvío de la central y para transportar del desvío a la central: *15¢ básicos más 5¢ por tonelada por kilómetro*, si la distancia de la pieza al desvío es de más de (1) kilómetro.

(g) Vagonetas de la central desde la pieza a un desvío y trasbordo con grúa a vagones de la central y del desvío a la central: la central no pagará nada por concepto de arrastre y arrimo. Si las vagonetas y vías desde la finca al desvío pertenecieren a o fueren alquiladas por los colonos, la central les pagará la cantidad de *5¢ por tonelada por kilómetro*, si la distancia de la finca al desvío es de un kilómetro o más.

*En todos aquellos casos anteriores en que las centrales tengan que pagar las cantidades indicadas a los colonos por concepto de arrastre y arrimo, la central no pagará a los colonos más de $1.00 en total, por tonelada, incluyendo los 15¢ básicos.*
                                                                          ,"

[11] Aun cuando en el Art. 7 del Reglamento General para las Compañías Azucareras, aprobado en 29 de junio de 1946 por la Comisión de Servicio Público, dicho organismo se reservó la facultad para determinar la compensación, la realidad es que siguió prevaleciendo la fórmula transcrita en el escolio anterior.

[12] Cuando la ley intentó imponer a las centrales el pago total de ciertos servicios así lo hizo expresamente, como por ejemplo, en el caso del servicio de grúa. Art. 6(a), 5 L.P.R.A. sec. 375.

*en Camiones, Puerto Rico, 1954,* Boletín 142 (1958) y *An Economic Study of the Handling of Sugar Cane by Motor Trucks, Puerto Rico, 1948 and 1949,* Bulletin 100 (1951).

Este marco histórico nos lleva a considerar el efecto de la enmienda introducida en 1962. Desde 1951 la compensación había estado establecido por la propia ley y, por ende, sólo podía alterarse mediante acción legislativa. Apercibida de que los costos de transportación habían aumentado desde que se adoptó la fórmula original, era de rigor reevaluar la situación en cuanto a la contribución de las centrales para sufragar estos costos. Pero en lugar de fijar estatutariamente la cantidad a pagarse se delega en el organismo especializado en la materia para que previa audiencia a las partes *pueda aumentar* la compensación fijada. Véase el escolio 1 *ante.* A este respecto el legislador cuidadosamente permite el aumento, mas a renglón seguido autoriza a la Junta "a fijar la cantidad máxima que en cada caso la central vendrá obligada a pagar por concepto de arrastre y arrimo", ya que de aumentarse las cantidades básicas, necesariamente tenía que desaparecer el máximo de un dólar para ser aumentado en la forma que correspondiera. Una cosa era consecuencia de la otra. Sólo en el caso de aumentarse las cantidades básicas era que se aumentaría la cantidad máxima. Y como hemos visto la propia Junta después de considerar toda la situación mediante la aplicación del criterio adecuado—consideración de la participación total que recibe el colono por sus azúcares—no estimó que la solicitud de aumento era procedente, y mantuvo las cantidades básicas comprendidas en la fórmula tradicional.([13])

Las actuaciones legislativas posteriores a la resolución original de la Junta de 26 de febrero de 1965—mediante la

---

([13]) El efecto práctico de la orden de la Junta es conceder un fortunón (*windfall*) a un reducido grupo de colonos que transportaban cañas por una distancia de más de 17 kms. desde el punto de entrega hasta el molino.

cual se denegó el aumento en las cantidades básicas solicitado por la Asociación de Agricultores a nombre de los colonos y se mantuvo el máximo de un dólar—tienden a corroborar la interpretación que hemos expuesto. Estando pendiente aún la Regla 11 de la acción ejecutiva, se presentó en 11 de marzo de 1965 el P. de la C. 298 aprobado por ambas cámaras en 31 de mayo de 1965, que luego se convirtió en la Ley Núm. 60 de 19 de junio de 1965 (Leyes, pág. 126), que ordenó a la Junta Azucarera para que realizara un estudio de los costos de arrastre y arrimo desde el comienzo de la zafra de 1965 y tomando en consideración el resultado de ese estudio, las participaciones de los colonos en otros renglones y la habilidad de pago de las centrales, fijara compensaciones justas y razonables por concepto de arrastre y arrimo *y la cantidad máxima* que por tales conceptos deberían pagar las centrales a los colonos desde la zafra de 1965.(14) Vemos pues cómo la Asamblea Legislativa una vez más reitera la necesidad de la fijación de un límite máximo.

■ Más elocuente aún es la actuación de la propia Junta. Bajo la autorización concedídale por la ley mencionada adoptó en 17 de junio de 1966 la Regla Núm. 12, que fue aprobada por el Gobernador el 29 de julio de 1966, 5. R.&R.P.R. secs. 386–1 a 386–10,(15) y que si se examina en efecto dejó

(14) En el informe de la Comisión de Agricultura de la Cámara de Representantes, *Diario de Sesiones*, Vol. 19, pág. 1721, se alude a los cambios operados en la agricultura—el éxodo de trabajadores agrícolas, la emigración colectiva de la masa trabajadora a Estados Unidos, el reclutamiento militar, el aumento dramático en los costos de transportación, el tiempo perdido en los turnos para descargar los camiones de caña—y se expresa que "la compensación que por concepto de arrastre y arrimo de la caña que reciben los colonos ha sido jurisprudencialmente reconocida como parte de la participación que reciben los colonos por el producto de sus cañas : . . . ."

(15) Se fijan las siguientes cantidades según la distancia de arrimo: (1) menos de medio kilómetro, 15 centavos; (2) desde ½ kilómetro a 6 kilómetros, 50 centavos; (3) desde 7 kilómetros a 16 kilómetros, 50 cen-

inalterable el máximo tradicional de un dólar hasta la distancia de 17 kilómetros—en *Plata Sugar Co.* v. *Junta*, 82 D.P.R. 866, 872–873 (1961), dijimos que "Como la compensación legal por tonelada es de quince centavos por arrimo y de cinco centavos por kilómetro de arrastre, el máximo de un dólar tiene el efecto de desalentar el envío de cañas a ser molidas a una, central cuando el sitio de entrega está ubicado a una distancia mayor de diecisiete kilómetros de la finca de origen"—y sólo aumentó el máximo en veintiocho centavos, hasta $1.28, para cubrir el aumento acordado en la cantidad básica a razón de dos centavos por kilómetro cuando el recorrido fluctuaba entre diecisiete y treinta kilómetros. Estos catorce kilómetros adicionales que ahora se compensan, no a razón de cinco sino de dos centavos por kilómetro, requerirían que a su vez se reajustara el límite máximo en la forma correspondiente, a $1.28. Se ratifica pues nuestra interpretación de que el efecto de la Ley Núm. 54 de 19 de junio de 1962 no fue establecer una compensación sin límite máximo, sino que para la eliminación del límite de un dólar que hasta entonces figuraba fijado en el estatuto se requería una acción afirmativa aumentando las cantidades básicas.

En virtud de lo expuesto es innecesario considerar los otros planteamientos de los recurrentes. *Careciendo de base legal se deja sin efecto la orden de la Junta Azucarera de 21 de julio de 1965, y se ordena la cancelación y devolución de las fianzas de supersedeas prestadas por las centrales recurrentes.*

---

tavos más 5 centavos por cada kilómetro en exceso de 6 kilómetros; (4) desde 17 kilómetros a 30 kilómetros, $1 más 2 centavos por cada kilómetro en exceso de 16 kilómetros; (5) desde 30 kilómetros o más, $1.28.